IN THE UNITED STATES COURT OF FEDERAL CLAIMS

E-NUMERATE SOLUTIONS, INC., )
and ) Case No.
E-NUMERATE, LLC, ) 19-859C
Plaintiffs, )
vs. )
THE UNITED STATES OF AMERICA, )
Defendant. )

Courtroom 8
Howard T. Markey National Courts Building
717 Madison Place, N.W.
Washington, D.C.
Thursday, January 15, 2026
10:00 a.m.
Oral Argument

BEFORE: THE HONORABLE MATTHEW H. SOLOMSON, Chief Judge

Reported by: Matthew Yancey, CDR

APPEARANCES:
ON BEHALF OF THE PLAINTIFFS:

GERARD M. O'ROURKE, ESQ.
SEAN T. O'KELLY, ESQ.
O'Kelly & O'Rourke, LLC
824 N. Market Street
Suite 1001a
Wilmington, Delaware 19801
(302) 778-4000
sokelly@oelegal.com

ON BEHALF OF THE DEFENDANT:

SHAHAR HAREL, ESQ.
ANDREW CURRAN, ESQ.
United States Department of Justice
1100 L Street, NW
Room 8520
Washington, DC 20530
(202) 305-3075
shahar.harel@usdoj.gov

P R O C E E D I N G S

\- - - - -

(Proceedings called to order at 10:03 a.m.)

LAW CLERK: All right. The United States Court of Federal Claims is now in session, the Honorable Matthew H. Solomson presiding.

THE COURT: All right. Good morning, everybody. Please have a seat.

We are on the record in e-Numerate Solutions, Inc. vs. United States, case number 19-859. If I could have counsel enter their appearance for the record before we begin.

MR. O'ROURKE: Good morning, Your Honor. My name is Gerry O'Rourke on behalf of e-Numerate Solutions, Inc., and I'm at counsel table with my partner, Mr. Sean O'Kelly. We're with the firm, O'Kelly & O'Rourke, LLC, in Delaware.

THE COURT: Okay, great. Welcome.

MR. O'ROURKE: Thank you.

MR. O'KELLY: Thank you.

MR. HAREL: Good morning, Your Honor. Shahar Harel on behalf of the United States. Seated with you at counsel table is Andrew Curran, my DOJ colleague.

THE COURT: Excellent. All right. Good morning.

All right, everybody, we've got a lot to work through today. And I'm going to be honest, I'm trying to choose my words in a measured, measured way. But I've been doing this a long time at this point, when I'm coming up on my sixth year anniversary next month, and as I'm sure you all know, I've litigated on both sides, I've been doing this for 20 something years. These were some of the hardest briefs for me to read.

There are some cases where I sent pictures of them to colleagues from both of you and said, can someone -- I sent it to colleagues and said, someone tell me what they're saying, and we figured out it's not my lack of technical knowledge. It's that it's not clear. So it's going to be a little bit of a slog for us to resolve all of these. And at the end of the day, if we start taking too long, I'm just going to say the parties haven't met their burden and we're going to -- everyone's going to lose.

So that's a way of saying that I really am disappointed, and these need to get more crisp. And you need to understand that I'm not an expert in the field, and I haven't been on this case for four years, and I don't know what's going on. But my law clerk does have a patent background, and we did spend hours on these and made very little headway. Very little.

So, you know, you guys can end this later and commiserate amongst yourselves about how obnoxious I am or how dense I am, and that's fine, but that's not going to get you Ws. So that's my admonition as we begin. I'm sorry to say it that way to you. I'm sure you're both experienced counsel, but this was not good. So that's mostly with respect to the interrogatory issues.

Let's do the invalidity contentions motion and then the access issue, the protective order issue, and then we'll do the interrogatories last. I think if I had thought about this more, we would have just done this argument at my conference table in chambers, so we can all just talk. So why don't you all stay at the counsel table for now until maybe we get to the interrogatories issues. I think the other -- the first two motions we can kind of just talk through.

With respect to the invalidity contentions, those are documents that are provided in the nature of either initial disclosures or discovery responses. Those are not filed with the Court, correct?

MR. O'ROURKE: That's correct, Your Honor.

THE COURT: Okay. So this is, in a sense -- you know, I understand in patent cases you have these, but this would be, in a sense, your theory of breach or

your theory of recovery or -- and in this case, I guess more of an affirmative defense of invalidity and Plaintiff -- and the Government wants to amend their theory or provide an additional reference to argue invalidity. What is the prejudice at this point? We've got lots of discovery left. And I guess, in particular, what I did not understand is what your dropping claims had to do with their amending their infringement. I just -- I didn't get it.

MR. O'ROURKE: Sure, may I -- I'll address that, Your Honor.

THE COURT: Please.

MR. O'ROURKE: Should I stand every time I speak?

THE COURT: That's fine, yes.

MR. O'ROURKE: So, Your Honor, Judge Holte issued the schedule in the case. Not all courts do this, but they do -- he put a date for preliminary infringement and invalidity contentions and then final infringement and invalidity contentions, and the parties met those dates by sending disclosures. The Government -- so the date for serving final contentions from both parties has passed. Judge, we were originally asserting something like 90 or 100 claims and out of -- it's across the --

THE COURT: Well, let me just pause you, though.

MR. O'ROURKE: Right.

THE COURT: This happens all the time.

MR. O'ROURKE: Right.

THE COURT: There's a deadline in some filing or some contention, and, you know, a party comes in and says, yeah, I know my deadline to file the third amended complaint was last week, but nevertheless, I have good grounds to say I'd like to file another new complaint.

MR. O'ROURKE: Sure.

THE COURT: And we look at it and we say, well, where are we on the case? Oh, eve of trial, yeah, no, thank you.

MR. O'ROURKE: Right.

THE COURT: Still in the middle of discovery or discovery hasn't started yet, what's the harm, right? So that's what I'm doing.

MR. O'ROURKE: Right.

THE COURT: It's really kind of just a Gestaltist question of, what's the harm?

MR. O'ROURKE: So the harm is we had to make a reduction in claims and pick among the -- the initial claims we asserted and bring it down to 30. And one of

the things you look at --

THE COURT: And you had to do that because Judge Holte?

MR. O'ROURKE: Ordered that.

THE COURT: Okay.

MR. O'ROURKE: And so now we -- we had a schedule -- now, Your Honor --

THE COURT: I understand that that's routine, also.

MR. O'ROURKE: It is.

THE COURT: You don't see that in other types of cases.

MR. O'ROURKE: Right.

THE COURT: But in patent cases, often trial courts demand that -- and I guess the theory is if you can't prevail on one of your 30 claims, you're not -- you're not going to win.

MR. O'ROURKE: Yeah, it just makes it more manageable to prepare the expert reports instead of -- so that the experts aren't addressing 100 claims instead of 30.

THE COURT: Okay.

MR. O'ROURKE: So the schedule that was in place at the time said that we had to go down to 30, and then, at some point, we're going to have to go down

to 20, and then we're going to take it down to 10 for trial. Now, Your Honor, I don't know -- we haven't -- you vacated all the prior scheduling orders in one of your orders, but that was the order that was in place when we did it.

So when we made the reduction, we look at what does infringement look like, what is their invalidity theory? And their invalidity theory did not rely on the XBRL 0.9.

THE COURT: Well, you're saying that -- you know what you never say -- all right, let me say it in reverse. You know what you never say, not once -- maybe I missed it, and I'm always happy to stand corrected. We're all human, and I am not a large language module. I don't know what's in all of this stuff. It's not like I have it memorized. I don't think you've ever said, given the new invalidity theory, I would have chosen different claims.

MR. O'ROURKE: We probably -- we mentioned the claim reduction in the papers, but did not say it in the fashion that you just said.

THE COURT: Yeah, that's -- that's why there's no -- I couldn't understand the nexus between -- it was a non sequitur. He says I want to amend and there's no prejudice, and you say there is prejudice

because we reduced claims.

MR. O'ROURKE: Right.

THE COURT: Well, the way to say there's prejudice is we reduced claims and we would have picked different ones had we known. But you don't say that.

MR. O'ROURKE: Well, I mean, we haven't looked at what -- we haven't gone back and done in an exercise, would we have picked a different set of 30 or different claims in that 30 had -- if this comes in. We said that is the prejudice. We also attacked it on diligence, like, that they weren't diligent in finding it because we found it instantly using an AI tool. That's how -- we just simply said, was this published, and I think it was --

THE COURT: Yeah, but the fact that you found it faster doesn't mean that they didn't try hard enough. That's also a non sequitur.

MR. O'ROURKE: Right.

THE COURT: All right. I'm good, thanks. We're going to try and move this quickly.

Okay, Counselor, if I let you amend your invalidity contentions and they want to change their claims, are you going to object?

MR. CURRAN: Your Honor, we would object -- at least not to add additional claims. Thirty claims

is still a lot of claims to assert at this point in the litigation.

THE COURT: Well, they want to -- they had more. What if they just want to go back and pick different ones than the 30 they've selected based on your invalidity conventions?

I kind of get it, right? It makes a moving target. They pick a bunch of claims that you hadn't said or -- it's a -- I mean, this goes back to my experience in high school debate. You've got ten arguments. Someone wants to knock out two. You'd rather focus on your eight. So you just grant out the two claims and you focus on the eight. And I just got rid of a whole chunk of your case by doing that and it saves me time, it saves me energy, I focus on the eight.

You come in and say, well, actually, I think two more are invalid. You say, well, you know, had I known that, I would have picked the other two and granted out these two, or I would have granted out all four and I would have chosen others. It seems like, at a minimum, I should let you do this and let them move to change up their claims based on your new selections of invalidity. Why not?

I'm not saying I should grant it now, but, I

mean, they can move for it, and it seems like it would be very reasonable if they could explain that their old choices are undermined by your new choices. They should also get to make new choices.

MR. CURRAN: Your Honor, we wouldn't -- we certainly wouldn't object to them moving separately to amend their own asserted claims, not to exceed 30 at this point. But Plaintiffs did have an opportunity, about a year ago, to outline how they would change their claims in their response to this motion to amend invalidity conventions.

THE COURT: Wait, how did that -- this was a motion that you filed in August. What -- I'm not following. In fact, I'm not following much of anything.

Do you agree with my premise, first of all, that if you change your invalidity contentions, it's fair to say that Plaintiffs may have picked different claims to push to advance?

MR. CURRAN: Yes, Your Honor. I think that's fair to say.

THE COURT: Okay. Now, the next part, you just made some sort of timing argument that I did not follow.

MR. CURRAN: Your Honor, I -- as you alluded

to, Plaintiffs asserted prejudice without outlining how this sought -- this amendment we seek to make would have affected their selection of claims.

THE COURT: Right. That's why I wouldn't grant them carte blanche now, but I would invite them to move to amend their claim lists or however they presented it. We'll deal with that if they have it. Maybe you -- it's a nice bluff and you change your -- you put a new reference -- invalidity reference, and they still stick with the same 30. I don't know. Who knows?

MR. CURRAN: That is possible, Your Honor. At this point, we couldn't speak to how we would respond to that.

THE COURT: I want to get this right. Mr. Harel, if you have something to add, there's no need for the formality.

MR. HAREL: Sure. So -- yeah, thank you, Your Honor. So, first of all, before -- in the abstract, without knowing which claims they would swap in, we can't necessarily address your question specifically. But we gave them this option before we made this motion. And we told them, if you're interested in swapping things, let us know, and we can explore that as an approach and avoid all this motion

practice. They did not provide us with any potential list. This was like last July.

THE COURT: Well, that was kind of in the nature of the meet-and-confer.

MR. HAREL: That was in the meet-and-confer.

THE COURT: Rather than you having to move, you tried to negotiate --

MR. HAREL: Yeah.

THE COURT: -- to say, hey, if you'll not oppose our amending our invalidity contentions, we'll let you change your claims?

MR. HAREL: Swap certain ones in and out --

THE COURT: Right, yeah, yeah.

MR. HAREL: Yeah.

THE COURT: To get to 30.

MR. HAREL: But we told them we'd want to know which ones so we could evaluate whether they'll be prejudiced to us. They said -- they didn't take us up on it, and that was -- that was back in July. We've been working on our case. We've been preparing lots of technical witnesses from lots of agencies based on these claims. These are the claims that we knew -- we know were the --

THE COURT: But they have the same complaint back, which is, well, we picked certain claims based on

what we thought you were going to move on invalidity.

MR. HAREL: Yeah.

THE COURT: Okay. You --

MR. HAREL: I'm just saying the point is that we --

THE COURT: Everyone's going to have to work better. I swear to you, I'm not going to keep doing this. We're going to keep moving this case forward. I can't -- I can't do the handholding like this. You guys got to be reasonable or I'm going to start doing kind of the baseball arbitration approach where I ask for proposals from both sides and I'll just pick the most reasonable one and I won't try and compromise myself.

All right, thank you. Let me ask you a question. Do you want to meet with them and confer again about the best way to do this or do you just want me to make a decision on what I got right here?

MR. O'ROURKE: We can talk to them. I mean, it sounds to us that you're going to allow them to amend --

THE COURT: Yes.

MR. O'ROURKE: -- and if that's the case, it's fair game for us to get a chance to reevaluate the 30 claims that --

THE COURT: Right.

MR. O'ROURKE: I think that --

THE COURT: But you know what I don't want is like another motion where you say, well, I want to add in these five more claims and then I get another motion from them saying, well, then I want to -- I'm done.

MR. O'ROURKE: Well, we wouldn't be filing -- I mean, the only reason we would file that is if they were being unreasonable about it in light of what they did. I mean, so, Your Honor, I hear what you're saying. We -- I don't know that you need to make a motion on it -- well, we should talk to them -- a ruling on it. We'll defer to the Court.

THE COURT: All right. So --

MR. O'ROURKE: But I got the -- we got the message.

THE COURT: So yeah, you're going to meet and confer then on whether you can come to an agreement that moots Defendant's motion and avoids a future one. Otherwise, I'm going to grant it and that's not good for you, because then I'm going to entertain their motion and we're going to be right back here with same thing. It's silly.

So you guys should just -- we'll give you a few weeks to see if we can work this out. But I guess

it is helpful data. I'm not saying that this initial approach was bad. I mean, but, yes, now you have the additional information that I don't see this as -- you didn't make a clear prejudice case, and I also see that what's good for the goose -- you should also have a chance. But we can't do this forever if every time someone changes position, someone else's changes position. So you're going to have to figure it out.

Okay. That gets us through that one. Let's move to the access issue. This one, I really do apologize if I missed this or if I don't remember from the last time we were on this issue. But Mr. Davis is the inventor.

MR. O'ROURKE: Yes, he is the --

THE COURT: And he used to have his own company, and that's e-Numerate.

MR. O'ROURKE: He was one of the founders of it. He is the inventor on all the patents-in-suit --

THE COURT: Can I just ask you another -- I'm sorry --

MR. O'ROURKE: Sure.

THE COURT: -- just a side question. It's a level set. Does anyone here have an actual software background or you're generalists?

MR. HAREL: I do, Your Honor.

THE COURT: You are a software -- okay.

MR. O'ROURKE: I'm a chemical engineer.

MR. O'KELLY: Mechanical engineer.

THE COURT: Okay. Well, we've got -- mechanical?

LAW CLERK: Physics.

THE COURT: Physics, okay. All right. Well, at least we have someone who knows -- who knows software. Well -- all right.

MR. O'ROURKE: Your Honor, the answer to your question was that Mr. Davis is the inventor. He was the cofounder of e-Numerate and was the chief technology officer. Still is to this day.

THE COURT: Right.

MR. O'ROURKE: It exists as --

THE COURT: Right. It's an active company, but it's not doing anything except suing here.

MR. O'ROURKE: Right, that's right.

THE COURT: Okay. And now he also works for --

MR. O'ROURKE: Econometrica.

THE COURT: -- Econometrica.

MR. O'ROURKE: Correct.

THE COURT: Okay. And he needs access -- I guess the question is -- I understand he's the one

that's making decisions for the Plaintiff and he's the only officer left to make decisions for the Plaintiffs?

MR. O'ROURKE: There are other officers that we talk to, but Russ has the technical background and -- Mr. Davis has the technical background and he's the most knowledgeable about this technology. So as things stand today, Mr. Davis is reviewing source code at the SEC based on the compromise we reached with the Government beforehand.

THE COURT: Let's talk about that. There's two rough buckets of information.

MR. O'ROURKE: Correct.

THE COURT: One is source code, one is financial government contract documents.

MR. O'ROURKE: Correct.

THE COURT: Okay. With respect to the source code, I have Mr. Harel's email to my law clerk about the agreement to the prosecution bar. And I see that the Government argued it's not -- the motion is not moot as to financial documents, but then also says it was not moot as to the source code. And I'm really confused by the email. So maybe we can just get --

MR. HAREL: That was the way we -- in an effort to allow Mr. Davis to see the source code as soon as possible and expeditiously move the case along

because e-Numerate didn't want to take our depositions until he specifically got to see the source code.

We told -- since the beginning, we told them he's able to see the source code if he agrees to a prosecution bar. So what we agreed to is he agrees to the prosecution bar, and based on how you rule today as to the necessity of the prosecution bar, if you think it's unnecessary, then that will be removed from him.

THE COURT: Got it.

MR. HAREL: This was an interim agreement.

THE COURT: Got it. Okay. So that's why it's not moot. You still oppose --

MR. HAREL: That was a joint email. Yeah.

THE COURT: So you agreed to it on a conditional basis subject --

MR. O'ROURKE: Because we -- obviously, you know, we knew we had a schedule in place and I could address trust --

THE COURT: So really nothing is moot?

MR. O'ROURKE: That's correct.

THE COURT: Okay. I kind of get it.

All right. Let's do the source code first. We might as well. I understand certainly why he needs access. He's the chief technical advisor to the Plaintiff. Will he also be doing the expert report?

Will you be trying to qualify him as an expert in this case?

MR. O'ROURKE: No, he'll consult with our -- with the testifying expert.

THE COURT: Okay. Well, that does raise an issue. Why does he need access then?

MR. O'ROURKE: Because he's the most knowledgeable, and the code is very confusing to a -- you know --

THE COURT: Even bringing in an expert?

MR. O'ROURKE: Yes, it's -- Mr. Davis can look at the routines and immediately recognize --

THE COURT: Immediately recognize.

MR. O'ROURKE: -- what they're doing.

THE COURT: Okay.

MR. O'ROURKE: That's why he's super-qualified. And so the Government does not oppose him looking at it. He's already started to look at it. He's going there tomorrow. We've been working cooperatively with each other to get him access to things. And what the Government has asked is that the current protective order be amended to include a patent prosecution bar.

THE COURT: And --

MR. O'ROURKE: We oppose that because the

original order that we agreed to didn't include that, when e-Numerate's patents are in force, and we've told the Government --

THE COURT: Right. We covered this last time.

MR. O'ROURKE: Right. The patents are not in force, right. We did, Your Honor. I don't mean to interrupt you.

THE COURT: No, no, I'm sorry. Keep going.

MR. O'ROURKE: So the patents are no -- there are no patents in force that Mr. Davis -- or applications pending where Mr. Davis is named as an inventor. So there's no need for a patent prosecution. That's why we said, look, it shouldn't be included at all. That's why we oppose that. But we said, look, we'll agree to it. If Your Honor wants to put it in, we'll be bound by it. But it shouldn't be in there especially --

THE COURT: How broad is it? What does it prohibit?

MR. O'ROURKE: It's a standard type of wording, very similar to the Federal Circuit Form 8. I think it's Form 8 or --

MR. HAREL: The Court of Federal Claims Act.

MR. O'ROURKE: The Court of Federal Claims,

Form 8.

THE COURT: Okay.

MR. HAREL: Form 8A.

MR. O'ROURKE: 8A. It's basically that language. And if you're not -- I mean, there are no applications, so you're not -- he's -- as I said, we've told them, look, you know --

THE COURT: But it's a bar for the future, right?

MR. O'ROURKE: Correct. But it's only to subject matter like the -- the way it reads is it has -- related to subject matter of the patents-in-suit in this litigation. And there's no -- he doesn't --

THE COURT: But then what's your harm? Why not just agree to it?

MR. O'ROURKE: Well, we can. I mean, we were just -- it was just there was -- it's been -- well, right. We could agree to that, and that's why we did ultimately sign it, subject to protest.

THE COURT: Okay. Well, I just asked you what the harm is and you said --

MR. O'ROURKE: The harm -- well, I mean, I don't know that --

THE COURT: -- you said, in effect, none.

MR. O'ROURKE: We don't want to expose the

inventor to any type of claim down the road that he wouldn't otherwise -- I mean, we are -- he is taking on a responsibility that he doesn't presently have by this. I mean, maintaining the confidentiality of their stuff, that's not a problem.

THE COURT: But if someone says to me, I want you to promise that you're not going to drive a Lamborghini in the next year, I'll say, fine, because I'm not going to be driving a Lamborghini in the next year, and I know that. I mean, I guess I could win the lottery and then that would be an imposition. I'll have to get a Bugatti instead. But I don't really understand. What are you giving away?

MR. O'ROURKE: Just a restriction on him at some point in the future, but there -- I agree, Your Honor --

THE COURT: It's for a limited period of time, right?

MR. O'ROURKE: Correct. That's what we're giving them. The only thing we're -- we're putting an obligation on him that he didn't have at the beginning of the case, never had, in return for seeing something that he should have always had access to in the first place. Is there conceptual harm to that? Yes. Is it something that's going to inhibit him in his career?

No.

THE COURT: And your -- the main argument is that if they wanted this, it should have been negotiated into this PO to begin with.

MR. O'ROURKE: Yes.

THE COURT: Okay. But now they're moving for it. I don't know what the -- again, if this were late in the day and they were moving for something and you had already seen it, it would be different. There's just -- the equities are such to me that -- and if it were five years or if you were in the business of pursuing more patents, we would have something to talk about. But I feel like the equity on this one is pretty clean.

We'll just -- I'm going to give them the patent bar. It's one year.

MR. O'ROURKE: Yes, Your Honor.

THE COURT: It's not even a big deal.

MR. O'ROURKE: Yeah.

THE COURT: Okay, okay. The patent bar is going to stand and -- for the code.

Let's talk about the financial bucket. I still am disturbed by kind of the lack of specificity. I would have appreciated just one example of what you're worried about.

MR. HAREL: Sure. So in the slides that we have put forward, pages 11 and 12, are --

THE COURT: Did they have notice of -- did you give this to them --

MR. HAREL: Yes, we did.

THE COURT: -- 24 hours in advance at least or --

MR. HAREL: No, we gave it to them this morning.

MR. O'ROURKE: Like when we walked in.

MR. HAREL: We're citing to -- this is an example of something that was cited in the briefing with respect to --

THE COURT: Okay. This was -- this was actually in the brief?

MR. HAREL: Eleven was 158-4.

THE COURT: Okay.

MR. HAREL: That was -- this was in the brief when this was up before when it -- Judge Holte was the judge.

THE COURT: Okay, got it, got it. Fine.

MR. HAREL: But this is an example of line items. So Mr. Davis explained that what he does in his procurement efforts at Econometrica, he does this about a dozen times a year for the past seven years, is he

puts -- he knows -- he puts in the line items for the contracts that they bid on. The winning contract --

THE COURT: Wait a minute, wait a minute. The contracts are all public.

MR. HAREL: The bid number, the total amount. But the specific line items are never released or not typically released. Those are kept confidential.

THE COURT: I don't think that's true.

MR. HAREL: It's my understanding that those are kept -- those are kept confidential.

THE COURT: The line item pricing of the issue -- of the awarded contract?

MR. HAREL: Not -- the line items, the specific line items. And one example is on 11. Another -- an even better example is 12, and this is exactly what he talked about. What he does is -- this talks about different people that will work on the project. So one contractor is a project manager and he will work 0.12 of full-time employees. So it's how many -- it's not just the rate of the people, but how many hours specific people will work on the project.

THE COURT: Yeah, this level -- I mean, there's been litigation about this in the -- I want to say the D.C. Circuit or the 4th Circuit on FOIA claims or what you can FOIA. Did you cite any of those cases?

MR. HAREL: We do not. We did not.

THE COURT: Okay. What does he need this information for now? He's not a damages expert.

MR. O'ROURKE: It's -- no, no, no, no, no.

THE COURT: So the technical side, I understood you.

MR. O'ROURKE: No. Right. So, okay, he does -- he doesn't necessarily -- the proposal from the parties is that they will be able to go back and designate swaths of stuff under this new category in the protective order that are financial. And we said, well, we don't need to show him that. They want to be able to go back and redesignate -- they produced over 200,000 pages in this case of stuff and we're going to --

THE COURT: It's already produced.

MR. O'ROURKE: It's already been produced without this new designation.

THE COURT: Okay.

MR. O'ROURKE: Now, they're going to go back and redesignate.

THE COURT: But if anything that's been produced without that designation, he's already seen?

MR. O'ROURKE: He has not seen that we don't --

THE COURT: Why?

MR. O'ROURKE: Because he's not been admitted under the protective order until recently.

THE COURT: Oh, so all of the stuff that's been produced is subject to this PO.

MR. O'ROURKE: Correct. And, Your Honor, so he doesn't --

THE COURT: And what precludes his access now?

MR. O'ROURKE: He doesn't -- he has access to the technical stuff. We have told them we won't show him the financial stuff until we get a ruling on this.

THE COURT: Right.

MR. O'ROURKE: And we have not.

THE COURT: I'm saying what is the language in the PO that currently covers the financial material that's blocking his access?

MR. O'ROURKE: So there's no specific category to finance -- like that -- to financial material in the existing protective order. It's just highly confidential. It's just a generic highly confidential.

THE COURT: But they've labeled that swath of documents highly confidential.

MR. HAREL: Correct.

THE COURT: And the Government's view is that he can't see the highly confidential.

MR. O'ROURKE: No matter what it is, technical or financial.

THE COURT: Okay.

MR. O'ROURKE: It looks like they resolved the technical stuff. The financial stuff is the --

THE COURT: But what does he need that for?

MR. O'ROURKE: Again, it's just the -- he doesn't necessarily need it, right? I mean, we don't -- they would be potentially able to designate things back under a new designation that might take back stuff that he should see. And we don't want to get into a fight about it. And the stuff is dated. If you look at slide 11, this is a 12 -- a 10, 11-year-old contract that they're --

THE COURT: If I look at what?

MR. O'ROURKE: Slide 11. Like that you would specifically require them --

THE COURT: Yeah.

MR. O'ROURKE: -- to articulate concrete harm. This is a contract. This is like talking about performance in 2014. That's what the bottom line is. This is a 10-year-old agreement. And we're like, what's the harm? I mean even if he did look at that,

this can't possibly be harmful at this point in time.

And the patents are expired. The last one expired in 2022. And the stuff they produce is all basically prior to that date. It's not stuff that's current financial information that he could potentially ever misuse.

THE COURT: But let me just understand the mechanics of the PO as it works now. The way it works is that the producer can designate something as confidential.

MR. O'ROURKE: Right.

THE COURT: And if it is designated as confidential, then --

MR. O'ROURKE: He can see it.

THE COURT: -- then someone can't see it unless they're admitted to the PO and they've objected to his admission under the PO.

MR. O'ROURKE: There are certain people that can see confidential information. Russ would qualify -- Mr. Davis qualifies for that. It's the highly confidential information.

THE COURT: Sorry. Okay.

MR. O'ROURKE: That's the other tier in the order.

THE COURT: And in order to see that, what

has to happen?

MR. O'ROURKE: He has to be cleared under the protective order.

THE COURT: And the reason he's not been cleared is because the Government objects.

MR. O'ROURKE: Correct. And we've been fighting about this for months. And as we've indicated, the financial information that they're trying to preclude him to see, I mean, it's stuff that's very old. It's not current financial information. It's --

THE COURT: Well, why don't I do it this way? Why don't I say at -- you figure out -- hmm, I'm trying to figure a few things out. Why is the Government the movant here?

MR. HAREL: We were moving to -- but for our -- the protective order requires the Government to move --

THE COURT: Right.

MR. HAREL: -- before somebody is cleared. And that's why we moved with this modification before --

THE COURT: Because where there's an objection --

MR. HAREL: Right.

THE COURT: -- and then they don't acquiesce to the objection, then you have to move or he is admitted.

MR. HAREL: Right.

THE COURT: The default would otherwise be admittance.

MR. HAREL: Right. And if I could just respond to this --

THE COURT: Yeah.

MR. HAREL: -- thing about these being stale. I don't remember the date of the one on slide 11, but I do have -- we produced this to the other side. It wasn't attached to the brief, but I have a copy for Plaintiffs and for Your Honor. The contract on slide 12 is from 2019, and some of these contracts have -- go on for years.

THE COURT: Right.

MR. HAREL: So we disagree that it's stale.

THE COURT: Yeah. So normally -- and this is something -- thankfully, I'm familiar with something in this case -- this is the kind of information that is not disclosed, let's say, in a bid protest or in a claim situation to someone who's in a competitive decision-making role like he is.

But it seems to me that the sensible thing to do here is to grant the motion to preclude access in general and then let you move -- if there are categories or specific sets of documents, like a privilege log, I can look at them and we can litigate particular classes of documents that you want to show him, that you have a need to show him. You can make the case for why you need it and we can actually look at those FOIA cases to see what's normally not releasable. What's wrong with that?

MR. O'ROURKE: Your Honor, we just -- the parties are in agreement that Mr. Davis can see all the technical stuff. I mean, we don't have a problem agreeing if it -- it looks like this is the way the winds are blowing here, that he doesn't need to see the financial stuff. We just don't want them to designate stuff, take this designation, and then we have a fight over what's technical, what's financial.

I mean, most of the stuff that's technical, it's very clear that it's source code. It's, you know, things that talk about the operations of the system. That's easy to dispute. We just don't want to get into an argument later down the road with them that, hey, this -- he should be allowed to -- you know, he was -- we showed him it and then he's now accused of violating

the protective order. That's the main concern. It's just to put him at risk for a future claim.

THE COURT: I'm sorry. Are we talking about having the Government re- --

MR. O'ROURKE: The -- yes. The proposal the Government makes is to modify the protective order to allow them to add a new category of information, which is highly -- and I don't recall the exact word, but it's basically highly confidential financial information or highly confidential competitive information. And they get to go back in their 200-and-some-odd-thousand pages and block designate things.

THE COURT: But the point is to narrow what's -- currently, there's a swath of documents labeled highly confidential.

MR. O'ROURKE: Correct.

THE COURT: And they're going to narrow that is how I understand it. Or is it going to --

MR. HAREL: We would need -- we would need to agree to a process with the other side. But what we were thinking was that we will get back to them within two to three weeks and say these documents that were previously disclosed -- produced as highly confidential are highly confidential. We called it competition-sensitive. We might reproduce them with that specific

Bates number so the counsel will know what we're talking about, but -- and then they can produce all the other highly confidential, but not highly confidential competition-sensitive documents to Mr. Davis.

THE COURT: But the result is that fewer documents will be off-limits than are right now.

MR. HAREL: Correct.

MR. O'ROURKE: Right, that's right. That's a reasonable proposal if they'll stick to that two-to-three weeks period. We can work with them on that.

THE COURT: Okay. When is discovery currently set to close?

MR. O'ROURKE: March 2nd, and we were -- we were going to talk about that with you. That was -- we talked beforehand.

THE COURT: Yeah, we're going to need to extend that. But that's a big redesignation in production. How many pages are we talking about?

MR. HAREL: I don't think it's -- I don't think it's that many. Plus, I think there are some that are queued up that haven't been produced yet. So I don't think it's that much for what's already been produced. I don't think it's more than a couple thousand pages.

THE COURT: Do you think you can do it in

three weeks?

MR. HAREL: Yes.

THE COURT: All right. So I'm going to grant the motion, but with a modified instruction along the lines that we just agreed to, where within three weeks, the Government will redesignate documents with the same Bates stamp. So we're all -- we all know what we're looking at, right? It will be --

MR. HAREL: The same Bates number, but with that designation.

THE COURT: The same Bates number, but some will be labeled proprietary and competition-sensitive or what are we going to --

MR. HAREL: Highly confidential-competition-sensitive is how we --

THE COURT: Fine. It will be done with an additional label of competition-sensitive. Anything not designated with competition-sensitive, he will -- Mr. Davis will have access to. And then anything that gets the competition-sensitive label, you'll have the opportunity to move to have that label removed.

I'd like to check the discovery rules. I wonder if that would be, in a sense, a motion to compel. I would like to make it so that you get your fees if they overdesignate, if you have to come in here

and move.

MR. O'ROURKE: Okay.

THE COURT: Let me check the rules. I'll write it in there if I can, because I want incentives to be aligned for people to do the right thing. And I get it, I've been in both of your positions before and you're both being zealous advocates for your clients, as you're obligated to do. And that's fine. But then there's my role, which is to do the right thing for the system overall.

And I think, in this case, that means making the incentives to make the designations reasonable, meaning you should protect the Government where you really think it needs to be protected, and if the Plaintiff's counsel has to come in here to get absurd designations removed, then the Government should pay for it. So I hope I can make that happen, and I'm going to check. But if I can, that's -- I'll write it in, and that everybody will do the right thing.

MR. O'ROURKE: Yeah.

THE COURT: Okay? All right. So we've got that one covered.

Now, we get to the hard stuff, and we're going to have to go rog by rog. I got to make sure I understand it. I have to understand what each party

responded. You all will just -- we'll just continue doing it the way we've done it so far. This has been working.

The good news here is that I think I understand what XBRL filings are because I've had to look things up on like EDGAR and SEC filings, and they have electronic tags on them that are used to manipulate data that's filed with the Government. Do I kind of roughly have that right?

MR. O'ROURKE: Yes, Your Honor, you do.

THE COURT: Okay. Yeah, I've had to use them before, so at least it's not entirely foreign. So Interrogatory Number 1, as I understand it, says, essentially, tell me all your systems that use the XBRL filing system. We want to know where does the Government use this tech or this software? That's basically what it is, right?

MR. O'ROURKE: Yes, that's right.

THE COURT: And when you say that the Government didn't provide a response for FDIC and FFIEC, does that mean that they said that it doesn't use that type of system or you know they use it, but they didn't answer this question?

MR. O'ROURKE: The current status, I believe -- and Mr. Harel can confirm this -- they updated --

THE COURT: Right, they updated it --

MR. O'ROURKE: -- the rog to provide FDIC/ FFIEC information. The dispute as to one is now limited to the Treasury/OMB.

THE COURT: Right, right, right. Okay. So far, law clerk summary is good, Mark. I'm following. Here's the problem and I noted this, so this is not just occurring to me, this is something we've already gamed out. Where do you mention in your motion to compel anything about Treasury or OMB?

MR. O'ROURKE: It came up in the reply brief because when we -- because of Interrogatory 2 and their counterargument on -- in their answering brief on Interrogatory 2. So in my --

THE COURT: How can Interrogatory 2 influence what you move to compel on Interrogatory 1?

MR. O'ROURKE: Because when their response to one is confusing, it indicated initially they don't do it, we took that at face value. When you look at Interrogatory 2, they said we do -- we send the file, the XBRL file, over in the form of a comma-separated value file. Therefore, we're not giving you this information. We don't infringe. That's why --

THE COURT: You're saying in response to Interrogatory 1 --

MR. O'ROURKE: We should have moved --

THE COURT: -- you thought --

MR. O'ROURKE: We thought it was a legit response first and now we --

THE COURT: And now you realize that -- that --

MR. O'ROURKE: -- it's -- it's --

THE COURT: Okay, fair enough then. I got it. Okay. So -- but still, Interrogatory 1 is still limited now to just Treasury and --

MR. O'ROURKE: Treasury/OMB.

THE COURT: Why do you link the two, by the way? Those are two separate agencies. One is a cabinet agency and OMB sits in the Executive Office of the President.

MR. O'ROURKE: When we filed the complaint, we weren't sure which entity actually runs the system. I mean --

THE COURT: Okay.

MR. O'ROURKE: That's -- that's why. That's why they're --

THE COURT: Do you know now? Do we know now?

MR. O'ROURKE: I think -- we think it's in Treasury. We're taking their deposition.

THE COURT: Okay, all right. We'll go with

the Treasury/OMB --

MR. O'ROURKE: We call it that for now, right.

THE COURT: -- for now, but I don't -- okay, that's fine. All right. It's a side point.

All right. So Interrogatory -- so we can move to Interrogatory 2 and then come back to Rog 1, right?

MR. O'ROURKE: Correct, correct.

THE COURT: Okay. So I'm not sure this ends up being an issue because I'm not sure the Government complains about this because they've responded. But I have to say I'm not even sure I understood Interrogatory 2. And as I read Interrogatory 2, it says, For each system you've identified in 1, tell me the documents that meet these -- that describe these items.

MR. O'ROURKE: Yes.

THE COURT: And these items are the claim limitations for your patent, right?

MR. O'ROURKE: They are taken from that, yes, for one of those --

THE COURT: It's a really weird request. It sounds to me like tell me all the documents that show I'm right that you've breached my contract. But why do

they have to do that work at all?

MR. O'ROURKE: Well, we said it's their contentions as to what is present in their system and there's --

THE COURT: I guess I don't understand that. How is it their contention?

MR. O'ROURKE: Well, we have the -- we provided our infringement contentions --

THE COURT: Okay.

MR. O'ROURKE: -- and we named stuff -- this -- we asked for them to give us an answer as well. And we -- that's sort of a rebuttal to our infringement contentions.

THE COURT: So this is the kind of thing, what I'm saying in the briefing, I was lost --

MR. O'ROURKE: Okay.

THE COURT: -- because I didn't understand --

MR. O'ROURKE: Okay.

THE COURT: There's no background. There's no discussion of where these items come from --

MR. O'ROURKE: Right.

THE COURT: -- or what you're trying to get.

MR. O'ROURKE: Right.

THE COURT: And I just -- I didn't -- I still don't know. I still don't get it.

MR. O'ROURKE: Right. So --

THE COURT: So these items are from where?

MR. O'ROURKE: Well, these items are from the patent claims in for the '748. I believe this is the --

THE COURT: That's what I thought. They're your claim elements.

MR. O'ROURKE: They are elements for the claim, yeah. And it's essentially almost like a noninfringement contention where, you know, and acknowledge which ones do you dispute are -- do you acknowledge these are present type thing. But the issue is --

THE COURT: No, but this says, Identify the document sufficient to show the following for the system. It doesn't really make sense. Sufficient to show an item? What does that mean? I can't read this interrogatory. I mean, obviously, they read it. This is not going to be held against you because they responded --

MR. O'ROURKE: Yeah.

THE COURT: -- and they didn't object on this basis. I'm telling you, even in English, I don't understand what that means. Identify documents sufficient to show the following. So sufficient to

show -- and then each item. Identify documents sufficient to show the system architecture, including any network browser. So you want them to show the documents that they've already -- this is stuff they've already produced.

MR. O'ROURKE: Well, we --

THE COURT: Which came first, the request for production or this?

MR. O'ROURKE: They were concurrent. We made requests for production and served the interrogatories.

THE COURT: So what you're saying is of the documents you produced concurrently, tell me by Bates number, I presume, which one of them have to do with these items?

MR. O'ROURKE: Yes.

THE COURT: Man, I never would have responded to that. I would say, do your own damn work. You figure out what part of my documents show your claim. So you're asking them to show you what documents you can use to show infringement. That's a weird ask to respond to, unless there's something like in -- you know, you do 50 patent cases and these are a dime a dozen, everybody does this and everybody responds.

I'm just thinking about it from like breach land. Show me what documents prove my breach -- prove

your breach.

MR. O'ROURKE: The law in contention interrogatories is evolving in patent cases and a lot more gets allowed than maybe used to back in the day.

THE COURT: But this is your contention. That's what I'm trying to say, like what --

MR. O'ROURKE: I understand. This is almost, though, show us where we're wrong type of --

THE COURT: Well, that's how it asks. But how would you do that? It's a negative. It's show us documents. They're going to say there are no documents that show that we infringe. Whatever. This is water under the bridge.

MR. O'ROURKE: Okay.

THE COURT: But you can now see why I was really confused because I couldn't even understand what you were asking that they were supposed to respond to.

MR. O'ROURKE: So here -- the issue is very simple. Like they -- they've given us responses for all the other agencies. They withheld a response for Treasury because they say that the information is transmitted --

THE COURT: Well, sir, I'm going to pause you for a second. The next explanatory line says this interrogatory relates to Claim 1 of the '748 patent and

seeks the Government's contentions about which components the Government contends meet or do not meet the elements.

This is not a contention interrogatory. It does not seek contentions. It seeks an identification of documents. And none of these documents could show that they do not meet the elements. Because I'm presuming that every system has a system architecture, so that's just a group of documents. Now, if you want to show -- it's not a contention interrogatory.

So I guess this does relate to the objection. The objection is that it shifts the burden of proof. I probably would have agreed with that. I don't know. But where are we now? What's left?

MR. O'ROURKE: Where we are now is that the Government has provided a response for all the other agencies and our position is they should respond -- provide the same type of response for Treasury and OMB. The OMB's --

THE COURT: And their defense is that there is nothing responsive.

MR. O'ROURKE: No, their defense is they don't transmit a document in an XBRL format. They transmit a document in a comma-separated value format. It's taking the information in the XBRL document, just

putting it in a different format, and then playing with it. We say that's equivalent -- you can't hold back discovery. I would say make a unilateral determination that we don't infringe. Therefore, you get nothing.

THE COURT: Where did you disclose the doctrine of equivalents theory?

MR. O'ROURKE: It's in our --

THE COURT: I spent like three hours last night on figuring this out.

MR. O'ROURKE: It's in our --

THE COURT: So I guess there's no requirement to have it in the complaint.

MR. O'ROURKE: It is in the prayer for relief of the complaint and it is in our infringement contentions that we served on them.

THE COURT: And is it element by element --

MR. O'ROURKE: It is --

THE COURT: -- or is it just a blanket --

MR. O'ROURKE: It is a generalized assertion, because now we have vetted -- well, our position is this is not a basis to withhold discovery. They should have said, hey, we don't infringe, and put that in response to Interrogatory 6 and say this is our reason we don't infringe this system. But they still should have to produce the information to us so we can

litigate it.

You can't deny discovery by claiming we don't infringe, and that's what they're doing. That's the core issue on Interrogatories 1, 2 and 3, that they're blocking --

THE COURT: Well, they didn't identify the system in response to Interrogatory Number 1.

MR. O'ROURKE: They said it doesn't exist. And that was the issue that we said, hey, we thought that was a legit issue. But when we saw in the reply in their opposition brief about Interrogatory 2, we said, wait a minute, Interrogatory 1, you're withholding it based on your noninfringement argument. And that's why we realized what the problem was.

THE COURT: But the way -- I mean, maybe you -- maybe if we walk back through your response, I will see this. But what I would have loved to have seen is something that is -- builds a syllogism that I -- I've said this -- have I said -- I might have said this to you guys last time, but I'm saying -- I say this to litigants all the time. I should be able to read a brief and say there's no question, Plaintiff wins. And then I should read the Government's brief and say, no, there's no question, the Government wins. And then I should read the reply and say, I don't know who wins.

That's a great set of briefs.

And when I was a clerk here, it happened all the time. I would come into Judge Allegra, may he rest in peace, and say, ah, Plaintiff wins. He says, have you read the defense brief yet? No. Go do that. Oh, man, I think the Government wins. Okay. Now you've got a problem, right?

And each brief I read, I should be -- it's clear. And the way I would have built this for someone like me is to say the doctrine of equivalents is X. Now, it happens to be -- I already kind of know what it is, but it's X. It has to be disclosed not in the complaint, but at some point in the litigation, they have to be on notice. We put them on notice. Here's how we put them on notice.

Now, that may be a bad fact because the way you put them on notice may be pretty weak or it may be limited, but you tell me. And then you say, what the Government can't do is come up with its own noninfringement theory in its head in order to avoid answering an interrogatory.

MR. O'ROURKE: Right.

THE COURT: And that's what they did here.

MR. O'ROURKE: That's exactly what they did.

THE COURT: They decided that this does not

meet the definition. Now, the hard question the Court's going to ask is, in propounding the interrogatory, did you define the terms in a way that clearly covers them, or did you rely on your own mental theory of equivalents in order to cover something that they weren't on notice of?

And that's my question here. Were they really on notice that CSV files were covered by -- I don't know and I don't really understand what you're asking, but --

MR. O'ROURKE: They were because --

THE COURT: -- I don't really think of CSV as being XBRL.

MR. O'ROURKE: Well, it's --

THE COURT: It's a comma.

MR. O'ROURKE: It's taking the data. They pull it -- will pull it right from the file into the XBR -- in to the CSV --

THE COURT: Right. So now, I've totally lost you. I don't know what file, what --

MR. O'ROURKE: Okay. They've taken it --

THE COURT: Because none of this -- is this -- none of this is explained anywhere.

MR. O'ROURKE: Yeah, yes, Your Honor.

THE COURT: Okay. So --

MR. O'ROURKE: The Government is taking an XBRL filing prepared by an agency.

THE COURT: Mm-hmm.

MR. O'ROURKE: It gets -- the information in there gets put into a CSV format and sent to the Treasury Department for processing. That information contains exactly what the XBRL filing does. And they're doing the same processing steps. They're doing the validation steps on the Treasury data. That -- we say that's an infringement under the doctrine of equivalents because the CSV file is equivalent to the XML-compliant document in the claims. That's what we will argue at trial.

They should have put that in a noninfringement contention and said we don't infringe because of this, but here's the documents as to that system. They're not doing that. In fact, they're not even producing code on the computer that Mr. Davis is going to review.

THE COURT: Let me pause you.

MR. O'ROURKE: Sure.

THE COURT: They might not have this argument available to them, they might not have even made it. But I just -- I'm trying to wrap my head around it. I'm telling you, if I read Interrogatory 1, I don't

know that I would have understood that.

Did you define XBRL or what it means to validate a filing in a way that, by its terms in the interrogatory, covers that information?

MR. O'ROURKE: I believe we did. I'd have to go back and look at the -- all of the --

THE COURT: How is it supposed to work? I mean, normally, I imagine to prevail in a doctrine of equivalents, you're going to need an expert that tells me that this is functionally equivalent.

MR. O'ROURKE: Yes.

THE COURT: So how does it work in discovery normally when we don't have that expert testimony, there's no declaration attached from an expert that tells me it's the same. There's no reference to online definitions or some publicly available explanation of computer science that -- I mean, how --

MR. O'ROURKE: Right.

THE COURT: Like I literally have to take your word for it.

MR. O'ROURKE: Well, no, the way it works in patent litigation is the system gets accused, they have to produce the technical information and the relative usage information in their case.

THE COURT: Pause. But the way they read

this, it's not covered. So how would they know that?

MR. O'ROURKE: Well, because we've -- we've accused -- we gave them infringement contentions where we point blank show --

THE COURT: But doesn't your theory then require the Defendant to make your infringement argument in their head and then respond?

MR. O'ROURKE: We gave them that in our infringement contentions. The DAIMS system is set forth in our infringement contentions.

THE COURT: The which? The which?

MR. O'ROURKE: It's called the DAIMS, D-A-I-M-S, system. That's the name of the system that Treasury runs. That system is outlined in our infringement contentions.

THE COURT: So you already knew that it was a CSV system or no?

MR. O'ROURKE: We pointed to it. They said it's a CSV file, it's not infringing, no discovery. And that's the issue here. They're withholding discovery based on their assertion that they can't infringe the claim, rather than produce the documents and put it in a noninfringement contention and deal with it --

THE COURT: So you're going to have to --

MR. O'ROURKE: -- at trial.

THE COURT: I hear you and I understand the appeal, and I think if I were you, I'd be equally upset. So I'm telling you, I get -- I get where you're coming from. I'm trying to steelman the position so that I can wrap my head around what you're saying. I'm telling you, if I read this, I don't know that I would read this as containing CSV or covering CSV or who knows if there's another system in another agency that you're not even aware of, that they are aware of, that they haven't disclosed to you. I mean, there could be like an infinite number of other systems that infringe that they've taken the position in their head doesn't infringe.

Now, I can see a -- just imagine, just go with this weird hypothetical from a nonpatent lawyer. They don't disclose it to you. You later find out about it. An expert comes in and says, this is obviously an XBR. This is crazy town that they didn't tell you about it. And I throw the book at the Government for violating discovery orders and the sanctions order is impressive.

But I can imagine another set of things they don't disclose to you because they've decided that -- right, this ends up being not so different from like

Brady material in a criminal case. The prosecutor has to give exculpatory evidence. They decide it's not exculpatory, they get in big trouble. And DOJ has had disciplinary actions. I know some attorneys got in trouble for not disclosing exculpatory evidence. It can ruin your career. So you make those calls at your own peril.

But those calls are always made. Is this something I have to turn over? It's not something that was asked for. But those calls are not wrong on their face. You have to prove that they were wrong. And so counsel has made a call that I read your interrogatory and it doesn't cover the system. And you're saying there -- that call was wrong.

MR. O'ROURKE: Yes.

THE COURT: I'm just saying you haven't -- I don't know that you've proven that to me or that it's obvious.

MR. O'ROURKE: Well --

THE COURT: How do I know that the CSV is exactly the same thing and it's not something else?

MR. O'ROURKE: It's -- well, I mean, that's our theory of infringement as to that claim. It's in our contentions. And as we said, we put a --

THE COURT: But you don't explicitly recite

CSV files as being equivalent, do you?

MR. O'ROURKE: We -- not specifically in the sense that we went element by element where it said, okay, this is equivalent. Now that we know that, we can do that because they have a motion to strike infringement contentions coming up. And that's one of the issues that they're saying, that we didn't say that. And, of course, we will say that if we are given an opportunity to do that.

The point is that it is -- we're in a situation where the case has been going on, this has been accused. They're just blocking discovery into the document and not giving us --

THE COURT: I understand.

MR. O'ROURKE: -- the similar information.

THE COURT: You really are just saying that they've taken an unfairly narrow read of this interrogatory --

MR. O'ROURKE: Correct.

THE COURT: -- in light of your infringement theory.

MR. O'ROURKE: Right.

THE COURT: And then denied --

MR. HAREL: Right.

THE COURT: -- and then denied to produce

information.

MR. O'ROURKE: Right. I mean --

THE COURT: I get it.

MR. O'ROURKE: And if we had -- I mean, look, we would have to serve another rog. In 30 days, we're going to be -- you know, we'll clear it up if we had to. I mean, you know, and then we get right back into it.

THE COURT: Well, you took the next thought -- I mean, I want to hear from Mr. Harel, but you kind of -- it's like, instead of all of this, you should have just asked me for another month to propound the interrogatory and you could have said, you know what, let me be clear. We view XBRL filings as including CSVs under the doctrine of equivalents. Produce everything that has to do with that. Thanks. I probably would have said, yeah, that's fine.

MR. O'ROURKE: Okay. I mean, we're going to be asking you for an extension in, I think, you know, a few months.

THE COURT: Yeah. That question sounds like fair game.

Let's start there. Is that question fair game? Just say they had written this interrogatory better, from my point of view, and they said, identify

all systems and components of the validated XBRL filings, including, but not limited to, using the other types of -- the following types of approaches. I don't know.

MR. HAREL: We don't think --

THE COURT: And when we said -- we'll do better. And when we said not limited to, we mean anything that could possibly look like that under a doctrine of equivalents, being the reasonable person that you are, or I don't know.

MR. HAREL: Well, first of all, we've never heard this doctrine -- other than a general -- we never heard this doctrine of equivalents between CSV and XBRL files until two months ago, on November 14th, when they filed their reply briefs. So that's first.

THE COURT: I sympathize with you. I got you.

MR. HAREL: That's one thing. Two, we gave --

THE COURT: I got the impression that the invocation of doctrine of equivalents here was catchall and very generic and kind of sporadic. And, in fact, I think you asked for a third amended complaint in order to assert it, but it ended up being just like a line.

MR. O'ROURKE: It's in the prayer for -- it

was a question that Judge Holte asked me, did you assert doctrine of equivalents in the complaint? And I said yes -- yes, it's in the prayer for relief.

THE COURT: Right. But even though, as I read the Federal Circuit cases, only a few, surprisingly, I did -- I spent a lot of time on this last night. Even though you don't have to meet Twombly/Iqbal fact pleading standards in the complaint in order to assert doctrine of equivalents, you do have to put the other party on notice, at some point, in some fashion with some specificity, it seems like, and I'm not sure you got there.

MR. O'ROURKE: Well, I mean, then the remedy would be we reissue the rog, and in 30 days, they respond and give us --

THE COURT: Yeah, yeah, I hear you, or -- and you could ask for more time and you could --

MR. O'ROURKE: Right.

THE COURT: -- ask for leave. There was obviously a misunderstanding on your part, on our part, new judge, new -- yeah.

MR. O'ROURKE: Yeah.

THE COURT: That would be like a sensible way to do all of this. But I'm asking, what would be the prejudice to you if I let them?

MR. HAREL: Well, I can give you -- well, first, just as background, we told them this stuff -- we explicitly told them this stuff about CSVs a year and a half ago. This -- that was our initial response. We weren't playing hide the ball.

THE COURT: Your initial response was what?

MR. HAREL: As to Rog 1, with respect to Treasury in June of 2024, we told them, there are -- we said, we interpret XBRL filings to be XBRL files that are filed with an agency. And then we said that -- in their complaint, they wrote their assumption was that Treasury receives XBRL files or receives files that are not XBRL files, but are modified into XBRL format.

The question didn't ask about the second, but we still answered and we told them these XBRL filings are not converted --

THE COURT: Do you have that attached to your response to this? That response?

MR. HAREL: Yeah. Let me give you the cite.

THE COURT: Yep.

MR. HAREL: It's docket 196-1.

THE COURT: Hold on one second.

MR. HAREL: At page 9.

THE COURT: 196-1. Where?

MR. HAREL: Page 9.

THE COURT: You know, we're always balancing truth and hunting for truffles. Did you cite this page in your brief?

MR. HAREL: Yes.

THE COURT: Okay.

MR. HAREL: Either this or some other version of the same -- substantively, the same.

THE COURT: Okay.

MR. HAREL: Another copy of that filing in --

THE COURT: Show me where I'm looking -- page 9 of the PDF stamp or the --

MR. HAREL: Yeah. Page 9 of 34, ECF pagination.

THE COURT: Okay. Let me just read this quickly. Thank you. (Document review.)

MR. O'ROURKE: What exhibit in the chart?

MR. HAREL: 196-1, page 9.

THE COURT: (Document review.) This was transmitted to -- these responses were transmitted to Plaintiff when?

MR. HAREL: June 28, 2024. They're not -- the date isn't labeled because this is the supplemental version. But you'll see the supplemental response is specifically dated. This is our original response. Actually, another version, which was the version that

was sent on June 28, 2024, is at 205-1.

MR. O'ROURKE: 205. Is that your reply brief?

MR. HAREL: That's our --

THE COURT: Yes.

MR. HAREL: -- reply to our cross-motion.

THE COURT: Okay, good enough. 205 dash?

MR. HAREL: And it's also page -- there, it's page 9 of 24.

THE COURT: Okay.

MR. HAREL: Because it was a smaller amount.

THE COURT: Okay. (Document review.) Okay. In response -- Plaintiff, in response to this disclosure, did what?

MR. O'ROURKE: We said that, when we were talking them, we are entitled to the information as to what to what you called for, the usage numbers that you're getting for this system and we --

THE COURT: Now, what I would have respected in response to this interrogatory response is a letter back to counsel saying we view this approach or however DAIMS is operating here as described as falling within our claims pursuant to the doctrine of equivalents. Please update your responses accordingly or we'll propound another interrogatory that does the same.

When did you register some --

MR. O'ROURKE: When we were meeting and conferring with them about the rog responses and we -- you know, we said --

THE COURT: When?

MR. O'ROURKE: It was like last year when we filed it at some point. It was before -- leading up -- we had a meet-and-confer with them about what rogs were going to be supplemented, and then we thought we had agreement with we would supplement --

THE COURT: Do you have attached here when the first time is you responded to the Government about this response?

MR. O'ROURKE: It's a -- it was going -- it was -- discussed all of the response. It wasn't as specific as to this particular response.

THE COURT: That's a problem. That's a problem.

MR. O'ROURKE: Yeah, so it was a generic discussion.

THE COURT: But let me just get it straight. Mr. Harel, though, all your -- your argument is you told them this a while ago and they waited a damn long time to bring this back here --

MR. HAREL: That's procedurally, Your Honor.

We would also --

THE COURT: Yeah.

MR. HAREL: We only heard of this DOE argument with respect to CSV/XBRL in November. If we would have additional briefing, we could -- the doctrine of equivalents is something -- in certain cases, it is something where no expert declaration is sufficient to put forward a doctrine of equivalents theory such that a court could strike it out at the get-go. And we believe that this is one of those cases.

THE COURT: Say that to me again. I didn't follow.

MR. HAREL: The doctrine of equivalents -- there are certain cases where a plaintiff is estopped from asserting the doctrine of equivalents based on the prosecution history, based on statements in the patent itself. And that's something that we would -- I suspect that we would avail ourselves of and we would file a motion to that effect.

THE COURT: Okay. The question is, would you want to do that before you produce in order to avoid producing? Do you want to litigate that now or you want to push it off to a pre-trial-type thing?

MR. HAREL: Well, if they were going to -- we

can also -- so they never complained about Rog 1. They complained about it -- once in the context of Rog 2, they told us there is -- once they saw that there wasn't a response for Rog 2 for Treasury, that's where -- the issue is --

THE COURT: But it makes sense. I mean, I see what he's saying. He's saying, I asked you to identify all the systems in which this XBRL is being used and now I see that you didn't respond with Treasury. You're saying, A, you put them on notice of it --

MR. HAREL: But, also, look at the specifics of --

THE COURT: Can I just pause you? If you knew about the DAIMS system because it's in your infringement contention, why wouldn't you look at the response to 1 and see that it's not disclosed and then object then?

MR. O'ROURKE: We told them we needed a complete response to 1 as to all agencies as part of our meet-and-confer.

THE COURT: No, no, but you didn't -- but you didn't -- even in your opening motion, you didn't put it in.

MR. O'ROURKE: We -- it was in the generic

letter that we agreed to supplement the responses. We said all interrogatories -- we thought that they would supplement as to all interrogatories. What they did is they provided supplementation for every agency except Treasury.

THE COURT: Well, I'm not -- I'm not -- these words are --

MR. O'ROURKE: I'm sorry.

THE COURT: You're not dating them. I don't know what -- let me go back. In your motion --

MR. O'ROURKE: Yes.

THE COURT: -- which is a post meet-and-confer --

MR. O'ROURKE: Right.

THE COURT: -- you did not move for Treasury and OMB.

MR. O'ROURKE: And to --

THE COURT: Let me frame my question. You did not move for Treasury and OMB.

MR. O'ROURKE: As to Interrogatory 1, that's correct.

THE COURT: Right. But by the time you filed your motion, you already were aware of the Treasury/OMB system called DAIMS, and you saw that their response did not include anything about that in response to

Interrogatory 1. You should have known.

MR. O'ROURKE: Okay. Well, Your Honor, we'll have to -- I guess we're going down the supplemental rog route if we need to. We thought we should -- we get this information now to move the answer -- the case along. Apparently, it could go either way, depending on your preference.

THE COURT: I'm trying to figure out factually if I'm right or wrong. You want to tell me I'm wrong? I haven't heard I'm wrong. You were -- when you filed this motion --

MR. O'ROURKE: We did not specifically move --

THE COURT: -- you were aware of DAIMS.

MR. O'ROURKE: Correct.

THE COURT: You knew it was operated by Treasury/OMB.

MR. O'ROURKE: Correct.

THE COURT: You knew that they didn't give you any information about that in response to Interrogatory 1.

MR. O'ROURKE: They gave us incomplete -- what we believed at the time we read it was incomplete information. They said we generated one --

THE COURT: Well, but if that were true --

MR. O'ROURKE: -- XBRL file.

THE COURT: -- you would have moved for it. Then, you were telling me that the reason why you didn't move forward is because you didn't realize it until you saw the response to Interrogatory 2.

MR. O'ROURKE: Two in their answering --

THE COURT: But that doesn't make any sense. You were already aware that of this system. Okay, I'm right.

MR. O'ROURKE: Okay.

THE COURT: I mean, you have a duty to candor. If I'm saying something that's completely crazy, then you should tell me.

MR. HAREL: No, we agree with you. We -- but we also substantive -- we don't think that a CSV file -- we don't think a doctrine of equivalents argument would apply to CSV, vis-a-vis, XBRL. But even if it did, look -- take a look at Rog 2. What they're asking is what the followup is. What are we supposed to -- here's a different system. What are we supposed to --

THE COURT: Right, right. It only covers whatever you responded to in 1.

MR. HAREL: No, no, but that system doesn't use XML documents. That's what part 2 -- what Rog 2

is, show us the system, which is not an XBRL system, which is a CSV system, and now tell us the documents that do -- where is the XML-compliant data document? There is no XML-compliant document. I suspect they're going to say, well, everything in 2, you should do it plus or minus the doctrine of equivalents. So it just goes -- it's like rabbits all the way down. Everything --

THE COURT: I agree with you. I agree. I agree with the Government. This is not going to work for me and for all sorts of reasons now that I didn't understand before.

Okay. So where does that leave us?

MR. O'ROURKE: You're probably going to -- well, 1, 2, and 3 are going to have the same issue because it's all --

THE COURT: Okay. So those are all going to be -- I'm going to deny the motion to compel on all those.

MR. O'ROURKE: Okay.

THE COURT: So now what?

MR. O'ROURKE: Four has a similar issue.

THE COURT: Let's come back to the question of what this affects. What can you do to cure it at this point? We've got -- what time is it in our --

we're in January.

MR. O'ROURKE: Right. We could serve --

THE COURT: You've got until March. You can serve a new --

MR. O'ROURKE: Right. We can serve a --

THE COURT: And you can move for a protective order and not answer on the grounds that this is out of bounds.

MR. O'ROURKE: Well, we're going to -- we were going to talk about --

THE COURT: You can meet and confer, but also -- right? You could serve a new --

MR. O'ROURKE: Right.

THE COURT: This is how this would work. You get a denial here; you're not out of luck. You can propound a new, more clear interrogatory that directly gets at what you want.

MR. O'ROURKE: Correct.

THE COURT: They still have time to answer.

MR. O'ROURKE: Right.

THE COURT: And if he doesn't like the interrogatory and he thinks he shouldn't have to answer it, he can move for a protective order to avoid the interrogatory, right? I mean, that's kind of standard discovery practice.

MR. O'ROURKE: Right.

THE COURT: Okay.

MR. O'ROURKE: We would have to go that route, it looks like.

THE COURT: All right. So if I say as of now that the CSV doctrine of equivalents should not have put the Government on any notice to answer these questions in the way that you wanted, whether it's because you were already aware of the system and the Interrogatory Number 1 isn't worded properly -- I mean, what I would have said, Mr. Harel, is that once you failed to answer Interrogatory 1 listing the system, Interrogatory 2 says, well, you only have to answer it for each system in 1.

MR. HAREL: Right.

THE COURT: In 1, they're on notice of it because you already told them about the system, they're already aware of it, and you didn't respond with that system here.

MR. HAREL: Right.

THE COURT: So I don't know. I think you're right or right enough, particularly when we have an ability to cure this.

MR. O'ROURKE: Yeah.

THE COURT: So if I deny -- if I just reject

the CSV doctrine of equivalents arguments at this stage for this purpose, limited, cabined, what does that affect? What are we left with here?

MR. O'ROURKE: Well, okay, we're going to be -- that's going to take care of the motion on 1 to 3. Four has basically a very similar issue for the SEC. Interrogatory 4 relates to transformation of XBRL files that the Government is refusing to provide an identification of the system because they take the XBRL data and put it into a database and that's where they play with it. We say that's equivalent.

Again, if you're going to make us propound a more targeted interrogatory that would take care of 4. We can do that for 4, if necessary. It's going to slow up some things, but we can do that to cure that one.

THE COURT: Let's pause. What is the Government's response on 4?

MR. HAREL: So we believe that, A, we answered it properly as it's written. That's one. Two, they could ask us a separate question about downstream system, which we don't think is in the scope of their -- of this rog. We also -- if they were going to assert a DOE argument such that what we're referring to as down -- this is actually -- if Your Honor wants to look, page 47 has Claim 1 of the '816 patent and

that's what we're talking about.

THE COURT: Claim -- I'm sorry, page?

MR. HAREL: Page 47.

THE COURT: Of what?

MR. HAREL: Of the -- of our slides.

THE COURT: Oh, page 47. Okay. A method and a data process.

MR. HAREL: So it's the -- it's the part that begins automatic -- automatically transforming. They are asserting a -- they're purporting to assert a doctrine of equivalents as to that, such that they can capture discovery as to where you don't trans -- you don't change two markup documents. You take something out of a markup document, you put it in a database, you destroy those markup documents, you have a database with all this stuff, and then anything downstream of that, that's also with within the scope of their patent based on what they're asserting as DOE.

THE COURT: Right, I get it. You think that's incorrect, obviously.

MR. HAREL: We think that's incorrect, but we don't even think that their question asks us for that because it talks about transforming numerical values, which we -- and I can give you exactly what it says. But we told them -- they never even asserted this DOE

theory until much after we answered our rog. They came up with that much later on.

THE COURT: You answered this on what date?

MR. HAREL: June 2024.

THE COURT: And when was the first time you heard a DOE theory back for them on this rog?

MR. HAREL: On this rog? In the course of this briefing.

THE COURT: In the course of the briefing?

MR. HAREL: In the course of --

THE COURT: The dispute?

MR. HAREL: At the meet-and --

THE COURT: At the meet-and-confer?

MR. HAREL: -- at the meet-and-confer, they put it forward.

MR. O'ROURKE: It came up during the motion to compel -- motion to amend, the third amended complaint, because they put the Hampshire declaration in in opposition saying it's futile. And we said, no, it's not, we have equivalents. There's an equivalents issue here. That was their -- then Judge Holte allowed the amendment and said it's not futile, you can assert equivalents. And that's why we have this dispute pending as to 4. If we have to retarget 4 to avoid -- you know, make it crystal clear, we can do it. It's

just going to slow up us taking SEC depositions, unfortunately. But we can do that.

THE COURT: Well, let me tell you, this is like where these judges' panels at bar conferences are helpful. Let me tell you what you guys have done to me now. I either agree with the Government and deny you something that you really are entitled to and need and should get under the fact that you have this line in your complaint or something in -- and that's reversible error. Or I give -- I grant that you're right and I'm telling the Government that they misread the interrogatory, which I'm not sure they did; that you're entitled to this stuff, I'm not sure you are; and it might not be reversible error, but it's just grossly unfair given, you know, what I'm reading and the lack of explanation. I don't really get the critique here.

I mean, the critique is -- as the motion goes, it's just not -- I mean, in other words, yeah, you're right, the Court allowed you to assert infringement based on the doctrine of equivalents. But you're -- but your new complaint is one line. It doesn't put them on notice on what you mean or for which system or how -- it forces the Government to make your DOE argument for you and then cough up the information based on your view of how the DOE would

work here.

Again, Mr. Harel, I'd ask you to be honest with me and tell me if what I just said was accurate.

MR. HAREL: So they -- let me -- additional context. This would have been October 2024, in opposition to their -- we -- they moved to compel; we opposed. In their reply, they said, okay, if there is an infringement, there is an infringement under the doctrine of equivalents. They never mentioned this rog and we never -- they never told us this rog is incomplete. So that was October, November 2024. They never told us that this rog was incomplete until July of 2025.

But when he says that Judge Holte allowed them to assert the DOE, that was not a substantive ruling. We had motions to strike. In our briefing, we said that the DOE argument is both --

THE COURT: Yeah, well, he obviously isn't agreeing that you're right about the doctrine of equivalents.

MR. HAREL: No.

THE COURT: He's saying that you're permitted to assert the theory in a general way.

MR. O'ROURKE: Right.

THE COURT: Yeah. But you say some funny

things in this motion, like the Court agreed with us that -- where did you say that? Ah, you said it somewhere, it caught my attention. It's a very limited agreement. It means that you could be right.

MR. O'ROURKE: Exactly. But that means we're entitled to discovery.

THE COURT: Yeah, but you have to ask clearly, right? Again, I see this as very little difference. And you're free to tell me that I don't know what I'm talking about and I will take it and I'm open to hearing it, but it's very similar to me of saying, tell me all the ways in which you breached my contract. No, I don't think I breached. So my answer is zero.

So you're saying, tell me all the ways in which, you know, you infringed under the doctrine of equivalents. I don't think I did, so I don't have any responses. Now, you're free to say, well, let me tell you what I mean by the doctrine of equivalents in this particular way. Now answer my question. And that's fair.

It's fair to say when I think -- when I allege that you infringe, I think that you infringe under the doctrine of equivalents if you did X, Y, and Z. Did you do X, Y, and Z? They have to answer. I

mean, in a depo, in an interrogatory. But I don't -- it's funny that you're not answering me directly. It makes me think that, like, I'm saying this wrong. But I feel like in order to give the information that Plaintiff wants, you would have had to made the DOE argument in your own head first and then given -- and then answered.

MR. HAREL: Right, yeah, for a lot of this stuff. And like he -- yeah.

THE COURT: But you're not saying that to me either, which makes me think that I'm wrong, I'm making an argument for you that's inaccurate.

MR. HAREL: They -- when we --

THE COURT: Do you think I'm wrong?

MR. O'ROURKE: The Government system -- we have limitations on our assertion of specifics because the government systems and the analytical systems are operated in secret. The only information we have to date is what's in the Hampshire declaration as to the identity of those systems, the names of the programs that they've specified. It's not clear from Hampshire which one of those systems does it. So that's why -- so are you right --

THE COURT: No, I just -- what I'm trying to say is that the fact that you think that there are ways

of infringing in an equivalent manner that's not literal infringement doesn't make these questions automatically answer -- what is a defendant supposed to do? You say, answer this question, they answer it very literally, and you say that was too literal, we have a doctrine of equivalents theory. Okay. Now, what am I supposed to do as a defendant? You haven't told me what the precise theory is for the particular system or the particular claim. I don't know what it is. And now you want me to answer the same broad question without knowing your theory. That requires me, it seems to me, to first make your DOE theory and then answer it. That doesn't seem right. But if I'm wrong about that, I expect someone to tell me.

MR. O'ROURKE: I think it's not as bad as that. The issue is very narrow as they take -- what we told them is that take -- they're saying they take the data from the XBRL file and put it in a database. So it's a database representation of what's in the document. That's what they're playing with. We say, no, no, no, that's equivalent to what's in the claim. It's the equivalent to what the claim is talking about, us transforming it into the documents themselves.

THE COURT: Let me give you an example. Let me pause you, I'm sorry.

MR. O'ROURKE: That's all right. I apologize.

THE COURT: In your argument, on page 13 of your motion, page 13 of the PDF stamp, you say, according to the Government, "Defendant understands this term to mean transforming numerical values in an XBRL file into different numerical files in an XBRL file." With this "understanding, the Government states the SEC has no such system."

Then you allege or argue this is an incomplete and evasive response. Now, it's incomplete and evasive if their understanding is unreasonably narrow or they're on notice of some precise view about what you mean with this interrogatory. Then I agree with you. But if answering it the way you want means it's something different, why shouldn't you have to define that term or put them on notice of how you want it answered? You want them to have a different understanding of the term based on the doctrine of equivalents, right?

MR. O'ROURKE: Yeah.

THE COURT: I think I'm correct.

MR. O'ROURKE: Yes.

THE COURT: You want them to have a different -- you don't like their understanding.

MR. O'ROURKE: Right, that's correct.
THE COURT: You want them to have a different understanding based on the doctrine of equivalents.
MR. O'ROURKE: Right.
THE COURT: Have you ever told them what that understanding is in this particular system, like with precision?
MR. O'ROURKE: With precision is the -- is going to be the --
THE COURT: Right. That's the problem.
MR. O'ROURKE: -- the bugaboo, right. I mean --
THE COURT: Okay. Well, we deal with precision. Okay. I'm going to agree with them. This is all remediable, though.
MR. O'ROURKE: Right, and we'll remediate it.
THE COURT: Okay, great.
What else is left?
MR. O'ROURKE: Five and 6 are their contentions, the basis for their affirmative defenses and their noninfringement contentions. They have outright refused to answer any of those interrogatories on the grounds that it's too early in the case, which is something, you know. But those we think are completely proper and should be fully responded to.

THE COURT: Here's what I'm going to do. I'm going to allow these to be -- if this is -- this is kind of like the same sort of choice, the baseball arbitration approach. I'll let you amend these at the very end if you want, subject to the proviso that if you say something that is brand spanking new and they want to reopen discovery or depos, I'm going to let them, with the caveat that when it comes to these contention interrogatories, I'm sympathetic to whatever party contends that they shouldn't have to disclose their entire case.

I hate it. I hated it when I was on both sides. You know, I'm not going to -- you're not going to come in with a cross exam strategy based on a bunch of documents and that you -- and they're going to say, well, you didn't tell us that you were going to raise that -- the fact that document 35(b)(2) contradicts, you know, our expert's report. You should have -- I told you to specify all the documents that you think undermine our theory and you didn't -- no one's obligated to do that. Trial by ambush just means that everyone's operating from the same information and that categories of arguments are not going to be new. That's all it means.

So I think that you could probably do this

towards the end with no prejudice to them. But if they feel like -- if you want to wait, then you have to risk that they claim prejudice and they want -- they want another shot at somebody because you said something that you never said before. But I guess I'll make the same warning. If Plaintiff does -- takes that shot and they don't have you dead to rights, I'm going to look for someone to move for costs.

So just everybody be reasonable. But I agree, kind of my impression is, at this stage, you can't adequately say all of this yet, that's fine. But you wait at your own peril and you choose the generality at which you answer these questions at your own peril and you come back to me seeking more at your own peril, because I don't think they have to tell you how they're going to cross or what documents they're going to use for what witness, you know, until you get much closer. They don't have to do it. They don't have to tell you which documents they're going to use at trial until there's an exhibit list. And they don't know, right? And sometimes you don't even know until the night before, right, when you're sitting in the witness prep room. Nobody knows.

So I'm going to deny this for now and we'll take a closer look. How close to the end of the

discovery period -- what if we say 30 days before the end of the discovery period, you have to update these.

MR. HAREL: Yes, Your Honor, that works for the Government.

THE COURT: Fine. And you can read them at 30 days to go and if you hate them, come back. I just really -- I understand -- even without the cited law and even without the different views, I understand that contention interrogatories are not new, they're not unique to patent law. I've used them myself. But there's a limit. No one should have to give you a brief and an outline of their trial strategy.

Okay. What's left now? What do we got? Seven is moot, moot, right?

MR. O'ROURKE: It is moot, Your Honor.

THE COURT: All right. Yea.

MR. O'ROURKE: So that concludes the motions that we had.

THE COURT: What about 6? Oh, it's just --

MR. O'ROURKE: Six is the other --

THE COURT: -- it's just the same.

MR. O'ROURKE: It's the noninfringement arguments. I mean, for example, they should have put we don't transform XBRL documents. That would be an easy answer for Number 6 on one of the systems, but

they didn't give us that. So that's the danger of taking the depositions without knowing what their arguments are.

MR. HAREL: Our point is that they're aware of that, that we gave that to them in the answer to another rog.

THE COURT: Well, that's a good point. How are they supposed to take -- well, I guess that is the issue, right? If you come up with a new noninfringement theory with 30 days left, I'm just going to reopen the depos for you --

MR. O'ROURKE: Yeah.

THE COURT: -- you know, and they can pay for it.

MR. O'ROURKE: That is the concern. I mean, we want to take their depositions once, not more than once. I mean, that's why we said give us -- they know what their arguments are going to be. I mean, the claim construction is out. I mean --

THE COURT: I understand, but I guess if we find ourselves back here with you saying they've amended their contention response -- their responses to contention -- let me -- I guess I'm a little confused now. There's contention interrogatories, but don't they also have to -- isn't there a separate

infringement and noninfringement contentions or no, those are one and the same thing?

MR. O'ROURKE: The Plaintiff serves infringement contentions;, the Government serves invalidity contentions.

THE COURT: Invalidity contentions.

MR. O'ROURKE: But they -- we don't -- we have to ask them for what their noninfringement --

THE COURT: For what their noninfringement contentions are.

MR. O'ROURKE: Correct.

THE COURT: Okay, okay. Well, yeah, I guess the point is, is that if you take a deposition and you're asking questions about -- tailored to noninfringement and they update their interrogatory answer later with a new noninfringement theory, you can come and explain that and -- I mean, listen, I had -- I'm sorry for the war stories, but I once did a 30(b)(6) depo out in California where the plaintiff's counsel was completely unfamiliar with the federal rules. He was a state construction litigator and a very talented one.

But the 30(b)(6) deponent had no -- didn't know the answers to any of my questions. And I said, what the hell is going on? Plaintiff's counsel says to

me, well, he's the person most knowledgeable, the PMK. I said, what the heck is a PMK? The person most knowledgeable. What the heck is that? That's not a federal rule thing, never heard of it. I'm not a state court litigator and never have been. So, oh, the California rules -- and he was a talented guy, smart guy, very experienced, certainly more experienced than I was at the time. I said, why are you citing me California rules? Anyway, the deposition was useless. I shut it down. I flew home to D.C. and moved to compel for a new deposition at plaintiff's expense. And I, from this Court, got it. I went back out to California, and that guy paid for the whole darn thing. It was crazy. I've been there.

So if they amend these late, and you come to me and you say, here's what we asked, here's what they said the first time, here's what they're saying now, these are materially different, and we were not on notice and we need another shot at these witnesses for four hours apiece, I'm going to give it to you. I'm going to make them pay for it.

MR. O'ROURKE: Yes, Your Honor.

THE COURT: But if they come back and they say, okay, we weren't hiding the ball, it wasn't right here, but they're on notice of this and four other

places, you're going to lose, right? So everyone be smart.

MR. O'ROURKE: Yes, Your Honor.

THE COURT: There's no need to show up and have a PMK. Don't do that.

So I guess my advice is I'll set it as -- at a minimum, at 30 days, these have to be -- your answers to these interrogatories have to be finalized 30 days before, subject to the caveat that if they change in a material way and they've already taken the deposition, they're going to get another shot at your cost.

MR. HAREL: Understood, Your Honor.

THE COURT: Does that make sense?

MR. HAREL: Yes.

MR. O'ROURKE: Yes.

THE COURT: You can tell me no. Okay. I think that covers everything. This was really helpful, I'm assuming. Is there anything else from here that we need to cover that you want to head off a controversy in the future that we should talk about now?

MR. HAREL: There's also --

THE COURT: Oh, there's the motion to strike.

MR. HAREL: -- cross-motions.

THE COURT: Sorry. And what -- that's your motion to strike.

MR. HAREL: Their infringement contentions.

THE COURT: Okay. So I had a question about that that caused me to go to the docket and spend an hour looking at the docket. Those are not documents that are filed.

MR. HAREL: Correct. They're --

MR. O'ROURKE: So strike is a real word -- is a weird word. I can't strike it -- usually, when I think strike, I think strike from the docket because it's improperly filed or violates a rule or wasn't signed.

MR. HAREL: It's -- that's the common usage with striking contentions. And it's -- most courts, most district courts, you don't file and it's referred to as striking the contentions.

THE COURT: Okay. And I should strike the content -- their infringement contention on what basis?

MR. HAREL: That they don't provide adequate notice of their theories.

THE COURT: Why can't they amend it now? You're amending like a million things.

MR. O'ROURKE: That's right.

MR. HAREL: So for --

MR. O'ROURKE: That's right.

MR. HAREL: So you just talked about us

preparing our witnesses. We've been preparing the SEC technical person. He was ready to go up in September. They've pushed back his deposition. Now, there's a possibility that they might be swapping in claims. We might need to prepare him as to other claims.

THE COURT: It's everybody's fault here.

MR. HAREL: But we are basing it -- our preparation of -- the scope of the case, of the offensive case, is defined by the infringement contentions. The infringement contentions are due even before discovery opens. And it's typical what you do is -- especially in software cases which involve source code, if you have the source code, you point to the source code. If you don't, you say this limitation will be filled in by source code.

Now, all the source code that they're citing to for the '748 patent and the '842 patent is publicly available. They've known about this from their -- from docket entry number 1, we cite to where they cite to Arelle GitHub.

THE COURT: Can you pause for just a second? Sorry, I'm just --

MR. HAREL: Sure.

THE COURT: I'm behind you a little bit. Give me a second. Where is your cross-motion to

strike? Okay, here it is.

MR. HAREL: It was --

THE COURT: It's in 196, correct?

MR. HAREL: Right.

(Pause in the proceedings.)

THE COURT: Okay, I remember what my issue was here. I have some notes, too. I mean, for, A, for example, why doesn't this -- this just ends up being fodder for summary judgment that, hey, it requires X, they didn't provide any support. I had a -- I'm not going to lie, Mr. Harel, this is one of the pages I sent to my colleague and said just tell me what it -- just forget the technical. I couldn't even follow the concepts. I'm sorry.

They provide illogical support for this limitation. I guess that means that the way they explain that you infringe that limitation doesn't make any sense. For example, e-Numerate says that it's available on GitHub. Okay, I'm lost, I'm just lost, I'm completely lost. And if you're right that it's illogical, why couldn't you just move -- like I said, why can't you just move for summary judgment that there's a record and the record shows that they're wrong?

MR. HAREL: Typically, courts -- before you

move -- okay.

THE COURT: This could be my, you know --

MR. HAREL: So we said this to Judge Holte about a similar thing, a year -- about a year -- what was pending in the fall of 2024.

THE COURT: Okay.

MR. HAREL: And he said, well, are you moving for summary judgment? That's too final a thing, effectively, is what he said for me to do at this point.

THE COURT: That sounds right.

MR. HAREL: Instead, you can move for them to refine their infringement contention.

THE COURT: Did you do that?

MR. HAREL: To strike or to refine. That's effectively what we're doing to -- we're striking --

THE COURT: Well, I'm okay with refining. Let them refine.

MR. HAREL: But --

MR. O'ROURKE: Yeah, that's right.

MR. HAREL: Yeah, but they can't just always -- they can't come up with totally new things. They can't make the universe go bigger. They can make the universe go smaller. Or if we tell them this source code citation, we don't understand what it is, they can

-- okay, when we said X, we meant X at page 253. They can't just say, when we said X, we meant A, B, C. That's what we're afraid of.

So we want -- we do want this to be stricken. Courts typically prefer that they get another chance rather than the summary judgment. They'll say it's too early for you to do that right now.

THE COURT: Right. I would say if -- I don't know if it's this illogical, I would have just sat quietly until before trial and then drop the summary motion on them and say they're out.

MR. HAREL: What we'll have is they'll come forward with different infringement contentions and they'll say, well -- they'll have something and then we'll be fighting about what have you changed.

THE COURT: Well, then discovery will be closed. That will be a problem.

MR. HAREL: No, they'll say, don't -- we're afraid they'll do that at the last moment and then it will be too late for us to move to -- like, you shouldn't be allowed to amend your contentions, this is a brand new theory and you've had years. You're supposed to have your infringement contentions even before the opening of fact discovery.

THE COURT: And so why didn't you have that

here? Why do you need to -- is it because they -- wait a minute, you tell me.

MR. O'ROURKE: Okay. So basically part of the issue is, you know, I mean, Mr. Harel is saying it is the source code. Mr. Davis just got to see the source code two weeks ago. And this is long after the deadline for final contentions. I mean, we should be able to -- if there's any issue, we should be free to move to amend them to specify what he's learning, for example, there.

And then one of their points here is on the DAIMS system, the XML document. Well, that's -- we've just spent probably an hour arguing about that when that's the doctrine of equivalents. Again, we can put that in there in a clearer fashion in the contention. We should be allowed to amend it. By strike, Mr. Harel basically means essentially kick us out and not let us do anything further with regard to this claim. That's what he's talking about by motion to strike, basically give them summary judgment right now.

THE COURT: Yeah, that's what it sounds like.

MR. O'ROURKE: Right. Which is not proper. I mean, if they're getting to amend, we should get to amend.

MR. HAREL: We're not asking for summary --

we're specifically not asking for summary judgment yet. What we are asking is for these -- for the infringement contentions to be struck as to these claims, and then if they come back with something, then we can discuss whether that new thing is an appropriate -- they would need to move -- we can -- either they would move for leave to amend to include this new thing or we can discuss with them and meet and confer and hopefully avoid motion practice. But that's the proper -- procedurally, that's the proper process.

THE COURT: I'm giving you leave to put in new prior art --

MR. HAREL: Well, A, you're doing that and letting them swap in different claims.

THE COURT: I said maybe, right?

MR. HAREL: But that is not a new -- we explain why that -- that's an earlier version of the prior art that we previously asserted. We asserted the 1.0 spec where -- we went back in time, the 0.9 spec, which their folks were tracking -- e-Numerate was working as part of it -- was working in this XBRL consortium back in 2000. They were aware of that specification. So there's no prejudice to them.

We don't know what their theory is. When we ask them what is the source code citation -- and

Russell Davis going to see highly confidential SEC source code has nothing to do with the source code which they cite, which is publicly available. They should have known that years ago.

THE COURT: This is just too brief for me. I just can't -- I just read it again. I still have no idea what you're saying here and I'm not going to do a full-blown tutorial for me on the spot. So --

MR. HAREL: Let me give you one example. If you --

THE COURT: Okay.

MR. HAREL: Page 59 --

THE COURT: All right.

MR. HAREL: -- of our slides and you'll see that this was part of the briefing. It's an attachment from the briefing. So this is their infringement contention --

THE COURT: Right. People are referencing Arelle as if I'm supposed to know what that is. You're lucky I know what GitHub is.

MR. HAREL: No, that's exactly our position. Arelle is some software that's available on GitHub. Which version of Arelle, which version of the code, which file? That's all publicly available, but they don't specify it.

THE COURT: But they have to specify it why?

MR. HAREL: So we understand what they're saying, what they're --

THE COURT: Well, I don't even know -- we have to back up so far for me to get this argument. Part of their claim is that they claim something, a system, a software, which includes an application that includes a network browser on a device for accessing a system.

Now, I know what a network browser is, but I don't know what a device is here and I don't know what a system is here. I guess I know what an application is, roughly. Okay. So they -- for you to infringe, you have to have an application including a network browser on the device -- on a device for accessing a system. And your complaint is what? That in order for them -- for their infringement contentions to be proper, they have to have detail about what?

MR. HAREL: Well, what is the application that they're talking about?

THE COURT: You mean the government application or the application the Government's using?

MR. HAREL: Well, they're also asserting that we are on the hook for third-party applications based on the statement of interest that we filed in a

district court litigation. And they have very broad allegations as to that. First of all, it's unclear to us the precise scope of that.

THE COURT: I mean, you've got to understand what I'm struggling with here. For example, with respect to the SEC, e-Numerate alleges that the source code for this project is available on GitHub on the Internet. I understand that you're quoting them, but when you quote it back to me, I have no idea what this project is. What project? I don't know what -- they're definitely referring to something, but when you quote it to me, I don't know what they're referring to. I'm lost. I'm utterly lost.

So I can't make sense of the argument because it's not built. I don't know what they're supposed to say. I don't know what's insufficient. The way I would expect this argument to be constructed is Claim 1 requires X. In order for the infringement connections to be proper, they have to explain to us what the Government does that meets this limitation. What they've said so far is A, B, and C. That is insufficient and makes no sense for these ten reasons. But that's not how this is laid out. I really can't even begin to understand what the complaint is about their response.

MR. HAREL: So page 64 of our slides is --

THE COURT: But your page 64 is some exhibit that's attached here. It's not explained in the body of the motion.

MR. HAREL: The reason why I'm calling it out is that that is what they -- what their infringement contention was for that element. There's nothing more to it.

THE COURT: Okay. Let me look.

MR. HAREL: That's the point we're trying to make.

THE COURT: Claim element, infringing agency, SEC, exhibit file. (Document review.) This would have been helpful to lay out in words. Who wrote what to notice on this page. This is from their claim chart?

MR. HAREL: Plaintiff's -- this is their infringement contentions for this -- for this element.

THE COURT: So this can -- the way you would read this -- I'll give Plaintiff's counsel an opportunity to respond. But, Mr. Harel, the way I'm -- the way you read this as a defense lawyer or I'm supposed to read it as a judge, is that they're only accusing one agency of infringing.

MR. HAREL: There are other pages for other --

THE COURT: Okay.

MR. HAREL: This is as to SEC.

THE COURT: So the claim against the SEC is based on this GitHub file, which is a publicly available piece of code written by whom?

MR. HAREL: The community. It might be an open source project or -- the relevant author is known.

THE COURT: Is there a dispute about whether you can be liable for using publicly available -- using, right? Is that the problem?

MR. HAREL: I think the dispute is whether we -- to what extent we authorized it.

THE COURT: Okay.

MR. HAREL: We specifically point to the specific code bases within the Arelle project that we use. We identified those.

THE COURT: Okay. One common apparatus -- I guess my point is that if you copy someone else's code and use it, you can still be liable for infringement. Yeah, that makes sense. If you take --

MR. HAREL: In theory, yes. In theory, yes.

THE COURT: -- someone else's widget and you use it, you've used it, right.

MR. HAREL: Right. Yeah. The dispute is not --

THE COURT: I'm trying to wrap my head on how these infringement contentions work. (Document review.) So I read this to say -- in not the best, but fairly understandable English -- that -- I mean, I would prefer active verbs and clear subjects and clear objects. But I think what this is saying is the SEC staff wrote code that is a available on GitHub. It is running with the Arelle application that the SEC also uses as part of their EDGAR Renderer project. When they use this code within the Arelle application, that meets this claim element.

MR. O'ROURKE: Right.

THE COURT: Is that what you meant?

MR. O'ROURKE: Yes.

THE COURT: Okay. This wording is terrible. It's not English; it's bad. I'm sorry. You don't -- okay. But I got it.

So now what's your problem with that?

MR. HAREL: Where is -- a network served application -- so there's a network served application and then there's a network browser. They need to show us where -- like an Internet Explorer, Google Chrome, those are -- those we would expect is what --

THE COURT: Well, why wouldn't you just move for summary judgment on the ground that they haven't

identified an explorer -- a network browser?

MR. HAREL: I think both options are available.

THE COURT: It's like, great, I would have read this and been, like, awesome. Is that what you're going to go with? That's your breach theory? Sweet. Great admission.

Now, what ends up happening is we're going to have a debate about whether a network served application is included in browser or not included in browser, but that's like par for the course with interpreting anything. I just don't know why I should strike it. That's their answer. You don't like the answer, maybe you win. They start talking about browsers later, maybe you move to striking at trial. They ask -- they stand up to make an argument about network browsers related to this particular application and you say, uh-uh, that's out, and I agree with you. Or they make a compelling argument that it's the same thing as a network served application. I don't know.

But strike? Strike seems not only -- I have to tell you, not only does it just seem wrong as a matter of, like, law and procedure, but it also strikes me as a very risky thing for me to do to mess up this whole case. Why would I do that? Yeah, I'm not going

to strike them.

MR. HAREL: What about the source code citations that they gave us, which are incomplete? On page 59, it's a simple --

THE COURT: That's a different part of your motion, right?

MR. HAREL: That's also with respect to striking their contentions.

THE COURT: But why don't I just make them supplement?

MR. HAREL: Supplements identified all those places which we pointed out, including --

THE COURT: Can you give me one test case so that we can take a look?

MR. HAREL: I think on page 59 is the easiest one where they just said Arelle on GitHub and they don't identify where that file is.

THE COURT: Claim element. What claim element are we talking about here? Seventy-eight --

MR. HAREL: Let me --

THE COURT: Okay. So this is a claim -- some claim element that I don't know. The agency that accuses FERC -- I guess they accused FERC of infringing by using this file, this application. Am I right? Wait, I'll wait -- why don't I ask -- I'll wait for you

guys to finish. It's fine. You can confirm and then I'll ask.

MR. HAREL: So it's part of 196-4 at ECF pagination 50 is where this claim element is specified. Accessing the plurality of computer readable rules.

THE COURT: Wait. 196-4 at what page?

MR. HAREL: Page 50 of 86. That's where that section begins.

THE COURT: Okay. The claim element is accessing a plurality of computer readable rules. (Document review.) Man, I don't know why everyone writes like this. Computer readable rules? Is like every piece of code a computer readable rule. I'm serious. Like what is it? What does that mean? What doesn't it mean?

Okay. So they claim that you practice this claim element at FERC and what? You can see where that file is at the PDF?

MR. HAREL: We want to know what file they're referring to. They're referring to something publicly available.

THE COURT: Oh, I'm sorry. Then I have to look at page 50 -- you said 51? Sorry.

MR. HAREL: Fifty-one is where, like, specific --

THE COURT: Okay. It's another example. So they have two examples of where FERC meets this claim element. One is the PDF that they cite. Am I reading that correctly?

MR. HAREL: I think what they're trying to say is that the -- the PDF is evidence that they do things, but --

THE COURT: Okay, okay.

MR. HAREL: -- where's the specific source code is -- that they're pointing to --

THE COURT: Okay. (Document review.) Yeah, yeah, you need to update these. Yep.

Is there prejudice to you if they update them now?

MR. HAREL: So for the specific source code citations, I don't think so, but we'd like to see what they put forward. We identified long ago which are the relevant Arelle source code code base, a code base like this -- Version 1.0 might be these million files. Version 1.1 might be these million files. And then they should be identifying it within the ones that we said we use 1.1 or 2.5, along those lines.

THE COURT: Okay. That makes sense to me. What's wrong with that?

MR. O'ROURKE: We were -- we will be happy to

amend. They didn't want us to amend. They wanted to strike. That's -- they've never -- amendment was never in their ask to us. And we told them we had -- it's in our --

THE COURT: When was the first time you went to them -- to Plaintiff and said this is patently insufficient?

MR. HAREL: We told them -- for these versions, it was in June of 2025. In July of 2025, they got back to us saying -- these specific issues with the source code citation are misleading or incomplete. They got back to us, we believe our infringement contentions are sufficient. That was the sum total of their response.

THE COURT: How could this be complete? How are they supposed to know where to look?

MR. O'ROURKE: Your Honor, I mean, as I said, said we -- I didn't directly prepare this. But I will -- I can see what he's saying and I will fix it. We will fix this.

THE COURT: But why would you respond that way? Was this particular one raised?

MR. HAREL: That one wasn't specific. There were other ones.

THE COURT: I can't do this in generalities

and with 25 examples.

MR. HAREL: No, but here's the --

MR. O'ROURKE: That's the problem.

THE COURT: You should update them. You should give him a list of the things that need to be -- I'll grant the motion insofar as you should provide a list. If he's got a problem with the list, do a meet-and-confer and we'll come back here and we'll do this again. But I'm not going to do it this way.

So give them a list of the ones that need to be updated. And if you think that -- three things -- I'm not going to write this all in the order, but I'm telling you. If you think that you previously put them on notice, that you complained about that particular lack of information, and they responded like that timely, and you didn't let it go for a year, come move for sanctions or to strike or for summary judgment and we'll toss it out. Okay?

That requires a bunch of things, though. It means you timely raise it. By the way, what you just told me was a year after. You raised this in June. Those infringement contentions are August of '24. So a year later you told them that you didn't like it. We'll see how long it took for you to raise it. We'll see how long it took for them to respond in a flippant

manner of you got everything you're going to get. And if it's egregious and they didn't just do it, then maybe I'll tell them too late.

But I can't do generalities and I can't do "see attached." I need arguments. Arguments are laid out with words that are clear that I can follow and I think I've proven that I can follow when it's explained properly from both of you. Sorry, guys. It's very upsetting. I've spent a lot of time on this. I've spent time in bed at night. I've spent hours. He spends hours. And when we can't figure it out, it's not us. So this is where we're at.

Is there anything else left from your cross-motion that we didn't deal with?

MR. HAREL: There was --

THE COURT: Let's do it.

MR. HAREL: -- a more minor one. This was -- they originally -- two things, they didn't identify documents according to 33(d). When they supplemented, they did do that, but they also have something in their -- all -- not all their responses to Rogs -- supplemental responses to Rogs 8 and 9, where they say we're also including all the -- everything that you can find on the Internet wayback archive, and they don't specify any URLs.

THE COURT: Yeah, you got to do that. They don't have to hunt that through the wayback machine. What part of your motion is that? Is that in the reply? What is that?

MR. HAREL: It's in -- it was what we filed on October 20th, and I'll give you the specific page. So yeah --

THE COURT: Sorry. We're in 196, 16 of 22?

MR. HAREL: And 17 of 22.

THE COURT: Right, I marked those. Yep. I even have a little asterisk next to it to say like, yes, that seems right to me. Yep. There's a -- there's a list.

MR. HAREL: It's --

THE COURT: Okay. I'm going to grant that part of your motion. This is just Roman Numeral 5, right? Yep.

MR. HAREL: And just -- we did give -- going back to the source code citation, we did give them a partial list and they never -- so they already have some -- the example I gave you --

THE COURT: Wait, what are you talking about now?

MR. HAREL: With respect to the missing source code citations in their infringement

contentions, we did give them a list --

THE COURT: You're back on the motion to strike.

MR. HAREL: I just -- yeah, I just want to say we already have given them a list. The example I'm giving you, that I gave today in court, was not on that list. But we've given them a list.

THE COURT: Okay. Well, give them a new list. We're going to instruct that within two weeks -- is that too long? Should it be one week.

MR. O'ROURKE: For them to give us a list?

THE COURT: Yeah.

MR. HAREL: No, we can give them a list in one week.

THE COURT: Okay. One week, a list of --

MR. HAREL: Source code citations and --

THE COURT: -- of inadequate source code citations from the infringement contentions, right?

MR. HAREL: Correct.

THE COURT: Okay.

MR. HAREL: Is there an expected time frame for them to respond to that?

THE COURT: How long are you going to need? How many do you think there are, Mr. Harel? Are there 50 or 10? Do you know?

MR. HAREL: There are about 20 that have already been -- that are attached as exhibits to the briefing that we've already identified to them, about 20 such things. And we'll see if there are additional --

THE COURT: When you say attached to the briefing -- you don't lay those out, though, for me, do you?

MR. HAREL: I can give you -- if you want the cite, I'll give you a cite.

THE COURT: However, e-Numerate failed to cite any source code for this limitation. See, e.g., 12, 36, 61, 87. All right, whatever, I'm not doing this.

How long do you think you need for 20 to 30?

MR. O'ROURKE: Is a month too -- 30 days unreasonable?

THE COURT: Well, shouldn't you know like where the code is that you think infringes.

MR. O'ROURKE: Well, I mean, I -- we have to go back to the code base and look at that. I mean, I -- Your Honor, I have just -- if it's that many --

THE COURT: Wow.

MR. O'ROURKE: -- could it be three weeks?

THE COURT: Yes.

MR. O'ROURKE: Okay, thank you.

THE COURT: And if you need more time -- I mean, the discovery deadline in this case is going to shift.

MR. O'ROURKE: Right.

THE COURT: But I'm not going to do this forever, guys. I won't do it. This is like what I call not quite the rocket docket.

MR. O'ROURKE: Sure.

THE COURT: But it's not what you might get from like the average compliancy of a compliant judge here that might grant unlimited number of joint motions for extension. I don't do that. We're going to -- we're going to get this to trial or summary judgment or something.

MR. HAREL: I have a specific cite now. It's 196-2 at page 7 of 9, I think, to 9 of 9.

THE COURT: Wait, 190- -- what am I looking at? 196?

MR. HAREL: 196-2.

THE COURT: What page?

MR. HAREL: Page 7 of -- ECF pagination 7. It begins there and I think it goes through the end.

THE COURT: Okay. So where is this cited in the brief?

MR. HAREL: I think it is --

THE COURT: No, it's not --

MR. HAREL: It is -- it is --

THE COURT: Where?

MR. HAREL: -- on ECF 205 at page 13 of 60.

THE COURT: No, 196 is where you move.

MR. HAREL: Yeah, but we -- 196 at page 21 of 22, where we cite to Exhibit B at pages 4 to 9 is the first place we do.

THE COURT: Wait, wait, wait. Where?

MR. HAREL: Exhibit B at pages --

THE COURT: Wait, wait. Your motion to supplement interrogatory responses for -- oh, failure to be able to identify source codes. Sorry. Twenty-one of 22. Where is it cited?

MR. HAREL: See Exhibit B at 4 through 9. Four, we explain how the source code is deficient, and then on page 22 of 22, we cite specifically the --

THE COURT: I'm just telling you, when I read this, the sentence before it says, as a software development -- developer would understand, which by the way, is a very funny turn of phrase because I'm not a software developer and you're talking to me. Each Git commit identifies the state of the code at a particular moment in time. See this exhibit.

I would never look that up because I would just take your word for it. You're not citing that for the proposition that here's the list -- what I would expect to say is the list of missing codes is to be found at Attachment 4, pages blank.

MR. HAREL: The next page. At the top of the next page, we do that. We identified over a dozen instances and --

THE COURT: Okay, there you go. Much better. Like, some examples would help. Even then, these are exemplary instances. You need to give them the complete list of what you're faulting.

MR. HAREL: Yes, Your Honor.

THE COURT: And really, I get it. You shouldn't have -- you shouldn't have to. And had this been raised really early like this, I probably would have said to them, hey, these are enough examples, you go through your own and get it right. But at this point, give them the list of what you think is a problem.

MR. HAREL: Yes, Your Honor.

MR. O'ROURKE: Yes, Your Honor.

THE COURT: Three weeks. He's right. I mean, these are bad cites. You shouldn't have to do the work. It should have been done right in the first

instance. And, you know, I should be punishing government counsel by making him compile this list. But we're going to do it. We're going to give you three weeks. You're going to get it done.

MR. O'ROURKE: Yes, Your Honor.

THE COURT: It should have been done right the first time.

Anything else?

MR. HAREL: I think both parties would want to discuss the case discovery schedule with Your Honor.

THE COURT: Okay. Do you want to just submit a proposed schedule or --

MR. HAREL: We both jointly want to propose moving the end of fact discovery -- it's currently at March 2nd -- to June 5th.

THE COURT: Done. June 5th. That will be a miracle if we get that done. Okay. Which means that your updated final, final responses to the contention interrogatories will be due May 5th. But, remember, you wait that long at some peril.

MR. HAREL: Understood, Your Honor.

MR. O'ROURKE: Yes, Your Honor.

THE COURT: Yes. Okay. We'll go around the horn one more time. Plaintiff, anything else?

MR. O'ROURKE: No, Your Honor.

THE COURT: I'm sorry. And remind me, which attorney I just -- the names.

MR. O'ROURKE: O'Rourke. I'm Gerry O'Rourke.

MR. O'KELLY: And Sean O'Kelly, Your Honor.

THE COURT: You're Sean O'Kelly?

MR. O'KELLY: Yes, Your Honor.

THE COURT: So you're counsel of record.

MR. O'KELLY: Yes, Your Honor.

THE COURT: Okay, thank you. Sorry about that. I should have written it down.

I know you guys. Okay. Anything else?

MR. HAREL: No, Your Honor.

THE COURT: Anything else?

MR. CURRAN: No, Your Honor.

THE COURT: Okay, we are adjourned. Thank you all very much. This was at least a helpful discussion. I didn't think we would get this -- get it done, but we did. Thank you.

(Whereupon, at 12:09 p.m., the hearing was adjourned.)

CERTIFICATE OF TRANSCRIBER

I, Elizabeth M. Farrell, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-titled matter.

DATE: 1/21/2026 S/Elizabeth M. Farrell

ELIZABETH M. FARRELL, CERT