# In the United States Court of Federal Claims

No. 19-859C

(Filed: February 26, 2026)

|  |  |
|---|---|
| **E-NUMERATE SOLUTIONS, INC.,** *et al.,* | ) ) ) |
| *Plaintiffs,* | ) ) ) |
| **v.** | ) ) |
| **THE UNITED STATES,** | ) ) |
| *Defendant.* | ) ) ) |

## OPINION AND ORDER

This case began in 2019 when Plaintiffs, e-Numerate Solutions, Inc., *et al.*, ("e-Numerate"), filed their initial complaint alleging that Defendant, the United States,[1] infringed seven of e-Numerate's patents. ECF No. 1. Six years, four complaints, and three judges[2] later, the parties remain embroiled in various discovery disputes. Before this Court now are the following motions: (1) the government's motion to amend its invalidity contentions; (2) the government's motion to preclude access to confidential information; (3) e-Numerate's motion to compel interrogatory responses; and (4) the government's cross-motions to compel interrogatory responses and to strike

---

[1] Although the named defendant in this Court is always the United States, *see Double Lion Uchet Express Tr. v. United States*, 149 Fed. Cl. 415, 420 (2020); Rule 10(a) of the Rules of the United States Court of Federal Claims ("RCFC"), e-Numerate specifically accuses the following government agencies of infringement: the Securities and Exchange Commission ("SEC"), the Federal Deposit Insurance Corporation ("FDIC"), the Federal Financial Institutions Examining Council ("FFIEC"), the United States Department of the Treasury ("USDOT" or "Treasury"), the Office of Management and Budget ("OMB"), the Federal Energy Regulatory Commission ("FERC") and the United States Department of Energy ("DOE"). ECF No. 142 at 2.

[2] This case was initially assigned to Judge Lydia Griggsby, ECF No. 2, later transferred to Judge Ryan Holte, ECF No. 12, and was most recently transferred to the undersigned on April 14, 2025. ECF No. 169.

infringement contentions.  This Court held oral argument on the pending motions on January 15, 2026.  ECF No. 208 ("Tr.").  This Court addresses each motion in turn below.

## I.    BACKGROUND

This Court assumes familiarity with the protracted history of this litigation as set forth in previous orders, *see*, *e.g.*, ECF Nos. 109; 178, and thus provides only a basic recitation of the pertinent facts.

In a nutshell, e-Numerate alleges that the government infringed seven patents covering data processing systems employing a computer markup language used in financial accounting, data browsing, data manipulation, and similar applications.  ECF No. 142.  There are two patent families asserted in this case.  One family consists of six of the patents at issue — U.S. Patent Nos. 7,650,355 ("the '355 Patent"), 8,185,816 ("the '816 Patent"), 9,262,383 ("the '383 Patent"), 9,262,384 ("the '384 Patent"), 9,268,748 ("the '748 Patent"), and 10,223,337 ("the '337 Patent") — and all address similar technology: "a markup language . . . which allows numerical analysis routines to be written quickly, cheaply, and in a form that is usable by a broad range of data documents[.]"  '355 Patent at Abstract.  The patents in this family all relate to the same provisional applications: No. 60/135,525, filed on May 21, 1999, and No. 60/183,152, filed on February 17, 2000.  The last patent — U.S. Patent Nos. 9,600,842 ("the '842 Patent") — is the lone member of the second patent family and is directed to methods and systems that "allow users to efficiently manipulate, analyze, and transmit eXtensible Business Reporting Language ('XBRL') reports" and "to automatically build financial reports that are acceptable to governing agencies such as the [Internal Revenue Service]."  '842 Patent at Abstract.[3]  The '842 Patent is related to Provisional Application No. 60/263,518, filed January 24, 2001.

Judge Holte issued two claim construction orders: one on March 22, 2023, ECF No. 109, and the other on February 29, 2024, ECF No. 116.  Fact discovery began on April 1, 2024, with an August 5, 2024, deadline for the parties to exchange final infringement and

---

[3] According to the Financial Standards Accounting Board ("FASB"), the "XBRL (eXtensible Business Reporting Language) is the open international standard for digital business reporting. XBRL is used to deliver human-readable financial statements in a machine-readable, structured data format. Preparers using [Generally Accepted Accounting Principles] for publicly traded companies are required not only to create financial statements, but also to assign an XBRL tag to every number, table, accounting policy, statement, and note." *See* https://www.fasb.org/page/PageContent?pageId=/staticpages/what-is-xbrl.html&isstaticpage=true.

invalidity contentions.  ECF No. 118 at 3.  After those contentions were timely exchanged, e-Numerate, on August 12, 2024, moved for leave to file a third amended complaint.  ECF No. 122.  After a status conference, ECF No. 140, the Court granted e-Numerate's motion, ECF No. 141, and e-Numerate filed its third amended complaint on December 6, 2024. ECF No. 142.  Since that time, the parties have been engaged in discovery.

## II.    THE GOVERNMENT'S MOTION TO AMEND ITS INVALIDITY CONTENTIONS

On August 28, 2025, the government moved to amend its invalidity contentions. ECF No. 181.[4]  In particular, the government seeks to supplement its contentions with an earlier version of a prior art reference that the government already identified in its invalidity contentions provided to e-Numerate on August 5, 2024.  *Id.* at 1.  The government already provided e-Numerate with the XBRL 1.0 Specification (July 31, 2000),[5] and charted that reference, in view of U.S. Patent No. 7,028,312 ("Merrick"), to Claim 29 of the '842 Patent.  *Id.*  Thus, the government argues, Claim 29 of the '842 Patent is invalid as obvious in light of those two references, pursuant to 35 U.S.C. § 103.

The government has now located the XBRL 0.9 Specification, and wishes to rely upon it as another basis for invalidity.  The 0.9 Specification — which is the prior version of the XBRL 1.0 Specification — has, by definition, an earlier publication date than the 1.0 Specification.  ECF No. 181 at 2.  The government also asserts that the 0.9 Specification discloses additional substantive technical details not found in the 1.0 Specification; the government argues that such disclosures provide additional bases for its invalidity arguments.  *Id.* at 12-15.

---

[4] To be clear, the invalidity contentions have not been filed with this Court except as an exhibit to other filings (*e.g.*, the motions at issue).  Essentially, the government seeks leave to serve new invalidity contentions on e-Numerate, after the August 5, 2024, deadline has passed.

[5] According to FASB, "XBRL is an [Extensible Markup Language ("XML")] standard, which is maintained by XBRL International, a non-profit consortium of approximately 600 member organizations, companies, and government agencies around the world. It is available free of license fees and is being used in more than 50 countries." https://www.fasb.org/page/PageContent?pageId=/staticpages/what-is-xbrl.html&isstaticpage=true.  The XBRL specifications at issue in this motion are documents created by XBRL.org that facilitate uniform expression of information in financial reporting across all industry users who adopt it.  *See* ECF No. 181-1.  XBRL specifications are "technical specifications" that "form the basis of all XBRL implementations.  These specifications set out how to create and test the 'metadata' parts of XBRL[.]"  https://specifications.xbrl.org/.

e-Numerate opposes the motion arguing that the government was not diligent in attempting to locate the reference and that e-Numerate would be prejudiced by a new set of invalidity contentions at this stage in the litigation.  ECF No. 185.

## A.  Legal Standard

The Rules of the U.S. Court of Federal Claims ("RCFC") allow the modification of a court-imposed schedule only "for good cause shown and with the judge's consent." RCFC 16(b)(4).  Our appellate court, the United States Court of Appeals for the Federal Circuit, has held that diligence and prejudice are the relevant considerations in the "good cause" inquiry.  *See O2 Micro Int'l Ltd. v. Monolithic Power Sys.*, 467 F.3d 1355, 1366-68 (Fed. Cir. 2006); *MorphoTrust USA, LLC v. United States*, 132 Fed. Cl. 419, 420 (2017) (applying *O2 Micro* to the question of whether defendant could supplement its invalidity contentions after the deadline).

In the context of amendments to contentions, the movant must first demonstrate that its failure to locate and provide the relevant material should be excused because it acted diligently during discovery.  *O2 Micro*, 467 at 1366-68; *Demodulation, Inc. v. United States*, 126 Fed. Cl. 499, 507 (2016).  Courts routinely split this diligence requirement into two prongs: (1) diligence in discovering the basis for the amendment; and (2) diligence in seeking amendment once the basis for amendment has been discovered.  *See e.g.*, *Champion Power Equip. Inc. v. Firman Power Equip. Inc.*, 2025 WL 3187101, at *7 (D. Ariz. Nov. 14, 2025); *Digital Ally, Inc. v. Taser Int'l, Inc.*, 2018 WL 1138283, at *4 (D. Kan. Mar. 2, 2018); *In re Papst Licensing GMBH & Co. KG Pat. Litig.*, 279 F. Supp. 3d 28, 33 (D.D.C. 2017); *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 236 F. Supp. 3d 1110, 1113 (N.D. Cal. 2017). To determine diligence in discovering the basis for the amendment this Court considers whether there were "additional or unexpected results of discovery, along with the possibility of unanticipated construction of claim terms according to the court's claim construction order."  *Cellcast Tech., LLC v. United States*, 2019 WL 5959571, at *5 (Fed. Cl. Oct. 30, 2019) (citing *MorphoTrust*, 132 Fed. Cl. at 421).  Other courts also consider: "[t]he reason for the delay, including whether it was within the reasonable control of the movant." *Allure Energy, Inc. v. Nest Labs, Inc.*, 84 F. Supp. 3d 538, 541 (E.D. Tex. 2015) (citing *Computer Acceleration Corp. v. Microsoft Corp.*, 481 F. Supp. 2d 620, 625 (E.D. Tex. 2007)).

If the movant successfully demonstrates diligence, this Court then analyzes what, if any, prejudice the non-moving party would suffer if the motion were granted.  *See*

*ACME Worldwide Enter., Inc. v. United States*, 179 Fed. Cl. 303, 307 (2025). In assessing prejudice, this Court considers several factors, including but not limited to, "whether the non-moving party has been 'genuinely surprised or harmed,' whether discovery would be reopened, 'the effect of amendments on the construction of claim terms,' and whether experts have 'staked out comprehensive positions with respect to claim construction.'" *Return Mail Inc. v. United States*, 152 Fed. Cl. 455, 459 (2021) (quoting and citing cases, including *Kruse Tech. P'ship v. Volkswagen AG*, 544 F. App'x 943, 953–54 (Fed. Cir. 2013); *Hitkansut LLC v. United States*, 127 Fed. Cl. 101, 109 (2016); *Cellcast Tech.*, 2019 WL 5959571, at *5; and *MorphoTrust*, 132 Fed. Cl. at 421).

There are other sensible factors that courts have considered when determining if good cause exists for leave to amend, including: "[t]he length of the delay and its impact on judicial proceedings;" and "[t]he importance of the particular matter," — or if the amendment sought is "vital to the case[.]" *Allure Energy*, 84 F. Supp. 3d at 541. Finally, courts also consider whether the amendment sought is "motivated by gamesmanship" and whether "there is sufficient time left in the discovery period to allow for discovery necessitated by the amendments." *Power Probe Grp. Inc. v. Innova Elect. Corp.*, 2021 WL 5280651, at *2 (D. Nev. Nov. 12, 2021); *see also Eisai R&D Manag. Co. Ltd. v. Shilpa Medicare Ltd.*, 656 F. Supp. 3d 515, 525 (D.N.J. 2023); *Zardo Prod., Inc. v. Feit Elec. Co.*, 2020 WL 7380465, at *5-6 (C.D. Cal. Sept. 30, 2020); *Digital Ally*, 2018 WL 1138283, at *3.

### B. The Government Was Diligent in Locating the XBRL 0.9 Specification and Moving to Amend Its Invalidity Contentions

This Court agrees with the government that it was diligent in attempting to locate the XBRL 0.9 Specification. First, the government began its search for this newly located reference in October 2023 — even before fact discovery opened — when the government asked the authors of the 0.9 Specification for any pre-1.0 versions of the XBRL Specification. *See* ECF Nos. 181 at 17-18; 181-10. After this request failed to turn up any early versions of the XBRL Specification, the government turned to the CEO of XBRL International, Inc., who likewise could not locate any extant copies of pre-1.0 Specifications. *See* ECF Nos. 181 at 18; 181-11. Finally, the government asserts that it conducted extensive online research, including through the "Wayback Machine,"[6] all to

---

[6] The Wayback Machine is an initiative of the Internet Archive, a 501(c)(3) non-profit, focused on building a digital library of Internet sites and other cultural artifacts in digital form. The Internet Archive's Wayback Machine is a digital archive of the World Wide Web, which allows users to

no avail.  ECF No. 181 at 18.  Until, of course, sometime in May 2025 when the government managed to find the 0.9 Specification in an "archival capture of a website that hosted the XBRL 0.9 Specification using the Wayback Machine."  *Id.*  While this is hardly the all-hands-on-deck hunt for evidence that one might expect from a party hoping to locate its *coup de grace*, the government's overall efforts to timely locate the 0.9 Specification — while not maximal — were nevertheless sufficiently reasonable.

A party need not exhaust every possible discovery avenue to be considered diligent.  *In re Papst Licensing GMBH & Co. KG Patent Litigation*, 279 F. Supp. 3d 28, 35 (D.D.C. 2017) ("[A] showing of diligence does not require a showing of 'perfect[ion].'" (quoting *Fujifilm Corp. v. Motorola Mobility LLC*, 2014 WL 491745, at *4 (N.D. Cal. Feb. 5, 2014))).  And that is especially true where, as here, the material or information in question is hidden in peculiar ways.  The 0.9 Specification was unavailable in physical form and could not be located with a standard online search or by XBRL International's own CEO.  This Court, and courts across the nation, have routinely found parties diligent where the references in question could not be located via traditional methods of research or discovery.  *See Cellcast Tech.*, 2019 WL 5959571, at *5-7 (finding the government diligent in discovering documents that "were not stored in a readily searchable format"); *see also Kroy IP Holdings, LLC v. AutoZone, Inc.*, 2014 WL 7463099, at *5 (E.D. Tex. Dec. 30, 2014) (Bryson, J.); *Prism Tech., LLC v. AT&T Mobility, LLC*, 2014 WL 656794, at *1-2 (D. Neb. Feb. 19, 2014); *Yodlee, Inc. v. CashEdge, Inc.*, 2007 WL 1454259, at *2 (N.D. Cal. May 17, 2007).

Relatedly, the government was meticulous in searching for prior art generally and in preparing its invalidity contentions.  The preliminary contentions were thousands of pages long consisting of sixty-five claim charts using thirty-five prior art references.  ECF No. 181 at 17-18.  This further demonstrates that the government's failure to locate the 0.9 Specification was not due to indifference, or worse, a self-induced torpor, but rather was due to the unusually obscure location of the reference.  *Karl Storz Endoscopy-Am., Inc. v. Stryker Crop.*, 2016 WL 2855260, at *5 (N.D. Cal. May 13, 2016) ("[Defendant's] initial invalidity contentions themselves belie a finding that its search was not diligent: they included over 500 prior art references among the 31 claim charts and 400 additional pages of analysis addressing [plaintiff's] claims."); *Illumina Inc. v. BGI Genomics Co., Ltd.*, 2021 WL 1022865, at *3-*5 (N.D. Cal. Mar. 17, 2021) (finding that defendant's thorough and comprehensive invalidity contentions — charting twenty-nine different prior art

---

view captures of past versions of websites as they existed on specific dates in the past, even if those websites no longer exist on the live web.  *See* https://web.archive.org/.

references and including thousands of pages of analysis — was considerable evidence that defendant was diligent).

And although e-Numerate itself was able to locate an online version quickly, ECF No. 185 at 6-7, one party's unique ability to probe the bowels of the internet does not necessarily demonstrate a lack of diligence of those less attune to the gastrointestinal workings of the online universe. Besides, the relevant question is not whether it was technically possible to discover the information earlier but whether the party seeking to update its contentions was reasonably diligent in attempting to find the information at issue. When viewing all the government's uncontested research efforts, this Court finds that the government exercised sufficient diligence in attempting to locate the XBRL 0.9 Specification.

The government was also diligent in moving for the amendment once it located the XBRL 0.9 Specification and recognized its importance to the case. The government managed to find the 0.9 Specification sometime in May 2025 and within a month had verified it, updated its claim charts, and produced the reference and those charts to e-Numerate. ECF No. 181 at 14; ECF No. 181-6. And only a short time later, on July 18, 2025, the government met and conferred with e-Numerate, in an effort to avoid filing a motion with this Court. The government's quick turnaround once it found the 0.9 Specification — especially given the fully charted reference provided to e-Numerate — is more than enough to demonstrate the requisite diligence.

## C. Amending the Invalidity Contentions Would Not Prejudice e-Numerate

Turning to the prejudice prong, e-Numerate's only complaint seems to be that it reduced its number of asserted claims in reliance upon the government's previous invalidity theories the government now seeks to update. ECF No. 185 at 8. But e-Numerate's assertion, standing alone, is a non-sequitur; e-Numerate does not suggest what it would have done differently had the government provided the XBRL 0.9 Specification to e-Numerate sooner. *Id.* To demonstrate prejudice, e-Numerate would need to show a nexus between the amendment sought and the harm inflicted. *See Glaukos Corp. v. Ivantis, Inc.*, 2019 WL 8348322, at *5 (C.D. Cal. May 20, 2019) (finding no prejudice because plaintiff only generally complained that "the overall strategy and dynamics of the case will be altered," but could not "point to wasted discovery efforts, delays in the case schedule, a need to alter its own substantive positions, or any other specific examples

of prejudice"). In other words, e-Numerate must demonstrate that its narrowing of its asserted claims would have differed had the 0.9 Specification been part of the government's original invalidity contentions. e-Numerate has not done that, nor can it even point to one claim that it would have switched in or out, had e-Numerate been made aware of the new prior art reference earlier in this case. Indeed, during oral argument, this Court pressed counsel for e-Numerate on this point but e-Numerate was unable to identify a single claim — dropped or asserted — that it would have kept or jettisoned. *See* Tr. at 10:3-10.

There can be no prejudice without an assertion of actual or even possible harm. Considering that discovery is still ongoing, that e-Numerate could not have been surprised because it knew that the government was searching for earlier versions of the 1.0 Specification, and that the new invalidity contentions have no bearing on claim construction terms or arguments, this Court finds that e-Numerate will not be prejudiced by permitting the government to update its invalidity contentions to include the XBRL 0.9 Specification. *See Kinglite Holdings Inc. v. Micro-Star Int'l Co.*, 2015 WL 6437836, at *4 (C.D. Cal. Oct. 16, 2015) ("[R]eceipt of the proposed amended contentions two months prior to the fact discovery cut-off provided [plaintiffs] with ample time to react." (internal quotations omitted)); *Glaukos*, 2019 WL 8348322, at *5 (allowing amendments because they "essentially expand on existing contentions").

In fact, if prejudice exists here, the government is the party that would be most significantly burdened were it not permitted to amend its contentions. Recall that this Court previously allowed e-Numerate to amend its complaint *after* final invalidity contentions were due and exchanged. ECF No. 141. And, indeed, in discussing the proposed third amended complaint during the status conference, ECF No. 144, the government voiced the concern that it might need to "reevaluate [its] invalidity positions and [its] invalidity contentions" if new allegations of infringement were raised. *Id.* at 23:1-10; *see also id.* at 24:5-8; 89:15-20; 91:6-11. While the government does not assert that e-Numerate's infringement position has changed such that the 0.9 Specification was once irrelevant but has now gained importance, fairness nevertheless dictates that if one party gets an extra substantive bite at the apple, the opposing party should as well. Put differently, e-Numerate cannot complain about the government's new position, when e-Numerate itself was permitted to change its theory of the case via the filing of a new complaint.

The remaining factors likewise favor the government. First, as to the length of the delay and its potential impact on judicial proceedings, this Court notes that fact discovery is still ongoing and expert discovery has not yet begun. Thus, the government's request to amend the intermediate discovery deadline to exchange contentions would hardly impact judicial proceedings at all; at worst, granting the government's motion would only slightly impact the current discovery schedule. This factor weighs in favor of the government.

Second, turning to the importance of the amendment to the movant, the XBRL 0.9 Specification is potentially vital to the government's case. Most obviously, the XBRL 1.0 Specification, published on July 31, 2000, cannot be used to invalidate the '748 Patent because the '748 Patent has an effective priority date of, at the latest, May 18, 2000. The 0.9 Specification, however, was published on April 4, 2000, which means it *can* potentially be used to invalidate the '748 Patent.[7] Additionally, the government points to the fact that the 1.0 Specification was charted in combination with another reference, while the 0.9 Specification requires no other secondary reference to invalidate the relevant patents because it contains substantive disclosures not found in later versions. *See* ECF No. 181 at 13-14 (explaining that the 0.9 Specification, as opposed to the 1.0 Specification, contains, *inter alia*, a "definition of the 'rollup' element" and "also includes a discussion of an auditing application" that improves the invalidity argument with respect to the "validation of a calculation involving data values" element in, for instance, the '842 Patent); *see also* ECF No. 181-6 at 11-16 (claim chart comparing the 0.9 Specification against the '842 Patent). This factor also weighs in the government's favor.

Finally, e-Numerate does not accuse the government of acting in bad faith or of somehow engaging in gamesmanship. The government may have been less proficient than e-Numerate at locating hard-to-find documents on the internet. But that charge does

---

[7] As mentioned above, the '748 Patent — along with each of the rest of the '355 Patent family — provides, on the face of the patent, that it is related to Provisional Applications No. 60/183,152, filed on February 17, 2000, and No. 60/135,525, filed on May 21, 1999. The government asserted that the 0.9 Specification, with its April 4, 2000, publication date, could effectively be used to invalidate the '748 Patent. ECF No. 181 at 13. e-Numerate did not dispute this in its response brief, but this Court is left uncertain as to precisely how the 0.9 Specification anticipates patents related to the earlier-filed provisional applications. e-Numerate's failure to raise this argument during this discovery dispute — assuming this Court is correct in comparing dates — does not constitute a permanent waiver. If and when the government asserts invalidity based on the 0.9 Specification, e-Numerate is not precluded from arguing that the '748 Patent specifically — and the '355 Patent family, generally — may indeed claim priority to the related provisional applications.

not dissuade this Court from finding that good cause exists to grant the government's motion for leave to revise its invalidity contentions.

Accordingly, the government's motion for leave to amend its invalidity contentions is **GRANTED**.  This Court is not unsympathetic, however, to e-Numerate's position.  If e-Numerate determines that the government's disclosure of the XBRL 0.9 Specification (as a basis for an invalidity argument) requires e-Numerate to swap in previously dropped patent claims, e-Numerate shall file an appropriate motion. Unfortunately, that comes with a risk that the government will then want to reassess the newly asserted claims and be forced to file various discovery motions in response.  At some point, this Court will call an end to the amendment ping-pong and each party will have to live with what is on file or has been exchanged.

### III.    THE GOVERNMENT'S MOTION TO PRECLUDE E-NUMERATE'S PARTY REPRESENTATIVE AND POTENTIAL TECHNICAL CONSULTANT FROM ACCESSING COMPETITION SENSITIVE AND PROPRIETARY INFORMATION

On February 27, 2025, the government filed a motion to preclude Mr. Russell Davis — e-Numerate's cofounder, chief technology officer, named inventor of the asserted patents, and proposed technical consultant — from accessing certain putatively confidential documents.  ECF No. 158.  This Court held oral arguments on the government's motion, ECF No. 175, and issued an order denying the government's motion without prejudice because, at that point, it had failed to demonstrate how "the information e-Numerate seeks to share with [Mr. Davis] would cause the government concrete harm." ECF No. 178 at 6.  But the Court "h[e]ld off rendering a final decision as to whether Mr. Davis should be precluded from accessing the Confidential Discovery Information" until after the government took Mr. Davis's deposition. *Id.*  The Court instructed that the government could then "refile any objection to Mr. Davis's accessing the Confidential Discovery Information." *Id.*  And, indeed, on September 2, 2025, following Mr. Davis's deposition, the government once again moved to preclude him from accessing certain information, albeit with some significant differences from the earlier motion.  ECF No. 183.  Rather than the broad effort to bar Mr. Davis from accessing the entirety of the government's production, the government now seeks to protect only a small portion of it.  *Id.* at 5-6.

### A.  Legal Standard

In general, this Court may, for good cause, "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way."  RCFC 26(c)(1)(G).  This Court has followed the United States Supreme Court's instruction that while "there is no absolute privilege for trade secrets and similar confidential information," a court should typically issue a protective order to shield a producing party from competitive harm.  *Hitkansut LLC v. United States*, 111 Fed. Cl. 228, 237 (2013) (quoting *Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340, 362 (1979)).  Before this Court issues a protective order, however, "[t]he party resisting discovery must first establish that the information sought is a trade secret or other confidential information under [RCFC 26(c)(1)] and demonstrate that its disclosure might be harmful."  *Hitkansut*, 111 Fed. Cl. at 238.  Once the opposing party has made such a showing, "the burden then shifts to the party seeking discovery to establish that the disclosure of trade secrets or other confidential information is relevant and necessary to the action."  *Id.*  Ultimately, "[t]he court must balance the need for the trade secrets or other confidential information against the claim of injury resulting from disclosure."  *Id.*

### B.  The Putatively Confidential Information at Issue

There are two buckets of possibly confidential materials at issue.  First, there is a group of documents that, according to the government, contain confidential financial information, including third-party contracting and pricing information related to the development and maintenance of the accused systems.  The government argues that access to this information would give Mr. Davis — who leads procurement efforts for another company — a competitive advantage when pursuing government contracts in the future.  ECF No. 183 at 5-7.

The second group of materials at issue relates to technical information associated with the accused systems, including source code.  ECF No. 183 at 7-8.  The government does not dispute that Mr. Davis — as a named inventor of the asserted patents and a technical expert — is well situated to determine e-Numerate's infringement positions.[8]

---

[8] Although this Court refers to Mr. Davis as a "technical expert," we do so colloquially in the sense that Mr. Davis — as inventor of the asserted patents — is proficient in the scientific area related to data entry technology and particularly the source code associated with that technology.

Thus, the government does not oppose Mr. Davis viewing this second group of material *per se,* but instead argues that he must submit to a one-year patent prosecution bar related to the technology at issue in this case.  If Mr. Davis were to agree to such a bar, or if this Court were to order one, this case can proceed with Mr. Davis's accessing the source code in question.  The patent prosecution bar would ostensibly preclude Mr. Davis from profiting (at least before the United States Patent and Trademark Office ("PTO")) from any technical insight gained by having viewed the government's proprietary, and arguably novel, source code.

After the government's motion was briefed, the parties agreed to allow Mr. Davis to begin viewing the source code after he signed an *interim* patent prosecution bar.  *See* Tr. at 19:16 — 20:19.  The parties agreed that this Court's resolution of the motion would either dissolve the interim prosecution bar or convert it into a permanent one.  *Id.*[9]

### 1.  The Financial and Competition-Sensitive Information

The government's motion seeks to preclude Mr. Davis from accessing confidential business materials including third-party contracting and pricing information.  ECF No. 183 at 5.  According to the government, access to this information would provide prospective bidders on government contracts insight into how potential competitors approach the contracting process, including how they price specific line-items.  *Id.*  And because Mr. Davis "leads procurement efforts" in his current position as a member of the "executive" and "leadership" teams at his current firm, Econometrica, access to this sensitive information would give Mr. Davis an improper advantage against his competitors.  *Id.*  The government thus proposes to review the material it has already produced and redesignate any documents that fall under this business information category as "HIGHLY CONFIDENTIAL — COMPETITION SENSITIVE."  ECF No. 183-1 at 5.  Mr. Davis could then have access to the entirety of the production except the supposedly few documents that would be so designated.  ECF No. 183 at 2-3.

---

This Court does not intend to suggest, however — particularly not at this juncture — that Mr. Davis will serve (or be admitted) as e-Numerate's actual testifying expert in this case.  Indeed, this Court asked e-Numerate's counsel during oral argument whether e-Numerate would seek to qualify Mr. Davis as an expert in this case at trial, and counsel responded that a different expert would testify.  *See* Tr. at 21:1-23.

[9] At oral argument, this Court and the parties referenced an email to the undersigned's law clerk.  The email — which is not in the record — attached a copy of the interim patent prosecution bar.

This Court has recognized that "competitive harm may result when the person accessing the proprietary information is involved in competitive decision-making." *Ross-Hime Designs, Inc. v. United States*, 109 Fed. Cl. 725, 731 (2013) (citing *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984)).  In *U.S. Steel*, the Federal Circuit defined "competitive decision-making" as "advice and participation in any or all of [a business's] decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor."  730 F.2d at 1468 n.3.  There is no real dispute here that Mr. Davis is involved in competitive decision-making for Econometrica and that genuinely sensitive material might provide him an unfair advantage in the realm of government contracting.  This Court must therefore assess: (1) whether there is likely any sensitive material to which Mr. Davis would have access; (2) what competitive harm the material might pose to future contracting processes; and (3) whether e-Numerate may nevertheless show that there is a need for Mr. Davis to access it.

Addressing the last question first, e-Numerate touts Mr. Davis as a "super qualified" technical expert because he is "the most knowledgeable" person with respect to "code [that] is very confusing[.]" Tr. at 21:7-17.  But e-Numerate admits that Mr. Davis will not be asked to provide testimony about damages, should we get that far.  *See* Tr. at 28:2-8 ("The Court: What does he need this information for now? He's not a damages expert. . . . e-Numerate's Counsel: No. Right. So, okay, he does — he doesn't necessarily[.]").  Accordingly, this Court has a difficult time imagining how or why Mr. Davis's accessing business information could be necessary (or even helpful) to e-Numerate's case.  And, indeed, e-Numerate does not suggest in its response brief that there is any need — pressing or otherwise — for Mr. Davis to access this material.  *See* ECF No. 186 at 4-6.

Instead, e-Numerate dedicates its brief to arguing that the government has not shown how it would be harmed.  ECF No. 186.  e-Numerate presents three primary arguments in support of its position.  e-Numerate argues that, just as was the case with respect to the government's earlier motion that this Court denied, the government once again can point only to speculative harm, but cannot show evidence of concrete harm.  *Id.* at 5.  e-Numerate further complains that the contract and pricing information at issue is many years old and stale; hence, no competitive advantage could be gained by accessing it.  *Id.*; *see also* Tr. at 30:14 — 31:6.  Finally, e-Numerate asserts that multiple government agencies have deemed Mr. Davis trustworthy on previous occasions, so the government cannot now be concerned that he will misuse any proprietary information illicitly obtained.  ECF No. 186 at 5.

This Court rejects all three of e-Numerate's arguments.

*First*, e-Numerate misunderstands the moving party's burden when seeking a protective order. Protective orders, as a rule, are prophylactic enterprises. *See Ross-Hime Designs*, 109 Fed. Cl. at 731. A party must only show that access to its proprietary information *might* cause actual harm, and a court then weighs the possibility and severity of such harm against the need of the opposing party to access the offending material. *In re Violation of Rule 28(D)*, 635 F.3d 1352, 1357 (Fed. Cir. 2011) ("[T]he courts have not given trade secrets automatic and complete immunity against disclosure, but have in each case weighed their claim to privacy against the need for disclosure . . . ." (quoting Fed. R. Civ. P. 26(c) advisory committee's note to 1970 amendment)); *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992) ("[W]e must balance the risk to [defendant] of inadvertent disclosure of trade secrets to competitors against the risk to [plaintiff] that protection of [defendant's] trade secrets impaired prosecution of [plaintiff's] claims.").

In this case, the government is correct that line-item pricing on government contracts is information that can be used to gain an advantage against competing government contractors. *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 520, n* (2010) ("[T]echnical or other details from the parties' proposals — such as contract line-item pricing — clearly constitute competition-sensitive information, the disclosure of which would allow a party's competitors to gain an unfair advantage in future competitions."). That is why this sort of detailed information is almost never public and almost always subject to strict protective orders designed to prevent decision-makers from accessing this sort of proprietary information. *See id.*; *see also Albertson's LLC v. Amazon Retail LLC*, 2024 WL 5657657, at *5 (W.D. Wash. Jan. 5, 2024) (requiring party to produce itemization of completed construction work with "redact[ed] line-item pricing").

As opposed to the government's earlier motion that sought to preclude Mr. Davis from reviewing the entirety of the government's document production, the government now targets only a subset of documents and has provided sufficient evidence that those documents contain competition-sensitive information such that access should be restricted. In sum, this Court concludes that the government has satisfied its initial burden to demonstrate the potential harm if the competition-sensitive information in question is left unprotected.

*Second*, while some of the documents and contracts the government points to as competition sensitive are older, other documents that were produced are more recent. *See* Tr. at 33:11-19. In fact, some of the contracts are still being performed. *Id.* Armed with all the current and recent contracts from dozens of agencies contained in the production, there is little question that Mr. Davis may obtain a competitive advantage over other potential bidders were he to have access to the non-public information that is the subject of the government's motion.

That said, this Court makes clear that it is not operating under any assumptions regarding Mr. Davis's ethics generally or about his likelihood to abuse any proprietary information. Other agencies may acknowledge that Mr. Davis is the most trustworthy and upstanding contractor with whom the government does business. But, as Judge Lettow observed in *Hitkanust*, even if this Court accepted that Mr. Davis "would make a conscious and sustained effort to comply with the terms of the protective order, the fallibility of the human brain is paramount. It is simply impossible for a human being to segregate or 'unlearn,' certain pieces of knowledge." 111 Fed. Cl. at 239; *see also In re Deutsche Bank Trust Co Americas*, 605 F.3d 1373, 1378 (Fed. Cir. 2010) ("[E]ven the most rigorous efforts . . . to preserve confidentiality" may fail because "'it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so.'" (quoting *FTC v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C. Cir. 1980))). Thus, any security clearances or access to information the government may have previously provided to Mr. Davis are irrelevant; access to the competition-sensitive information *in this case* may well furnish Mr. Davis with knowledge that the Court cannot expect him to magically segregate and protect in his brain.

Accordingly, because the government has made a credible showing that the information it seeks to protect is competition-sensitive and that there is a significant chance of harm if accessed by Mr. Davis — and because e-Numerate cannot show that it is necessary for Mr. Davis to have access to that information — the government's motion to preclude access and to amend the protective order is **GRANTED**. Within twenty-one days of the issuance of this order, the government shall redesignate selected documents, maintaining the same Bates number as in the original production, as HIGHLY CONFIDENTIAL — COMPETITION SENSEITIVE. Mr. Davis shall have access to all material not designated with the additional COMPETITION SENSITIVE label.

Thereafter, as discussed with the parties during oral argument, e-Numerate will have an opportunity to move for access to any documents it believes are erroneously designated. *See* Tr. at 37:16-21. If e-Numerate prevails on any such motion to compel, this Court will be inclined to award e-Numerate costs and attorney's fees associated with the motion, consistent with RCFC 37(b). *See id.* at 37:22 — 38:19 (this Court's warning the government about the likely consequences of over-protecting documents). This approach will hopefully provide reasonable incentives for all parties to act in good faith; the government can — as it should — protect the competitive procurement process of future government contracting, while e-Numerate should be able to access the necessary documents for its case.[10]

## 2.  The Source Code and Patent Prosecution Bar

The second tranche of material relevant to this motion is documents of a technical nature, primarily the source code that government agencies allegedly employ in infringing e-Numerate's patents. With regard to this material, the government proposes that Mr. Davis submit to a one-year patent prosecution bar — covering the subject matter of the accused systems — in lieu of the government's seeking to completely deny Mr. Davis all access to the code at issue. ECF No. 183 at 7-8.

In general, a patent prosecution bar becomes necessary when a decision-maker requires access to proprietary information in a pending case but could use the information to later gain an unfair advantage before the PTO. *See In re Deutsche Bank*, 605 F.3d at 1381 (holding that a patent prosecution bar may be appropriate where a standard protective order cannot sufficiently protect against the "risk presented by the disclosure of proprietary competitive information"); *see also Ross-Hime Designs*, 109 Fed. Cl. at 741-43. In the patent context, this most often arises when a litigating *lawyer* also assists clients in patent prosecution. *In re Deutsche Bank*, 605 F.3d at 1378-81. But imposing a prosecution bar on inventor-presidents — like Mr. Davis — is not a foreign concept to

---

[10] At oral argument, e-Numerate voiced a separate concern: that various swaths of documents that are not business-related — to which Mr. Davis *should* have access — would be erroneously redesignated, which would precipitate yet further discovery disputes. *See* Tr. at 34:11 — 35:12. This argument, while not frivolous, is not properly weighed under the applicable standard of review. It is not relevant to the harm incurred by the divulgence of proprietary information nor is it relevant to the ability of the party seeking discovery to effectively prosecute its case. It is merely a concern that granting the motion will lead to unwarranted delays and additional discovery-related motions. This Court is sympathetic to this concern. This Court hopes that its approach to resolving the pending motion will avoid the consequences that e-Numerate fears.

this Court. *See Ross-Hime Designs*, 109 Fed. Cl. at 741-45; *Standard Space Platforms Corp. v. United States*, 35 Fed. Cl. 505, 508-09 (1996). As this Court discussed at length in *Ross-Hime Designs*, the same logic that applies to patent attorneys — proprietary competitive information in their hands can be used before the PTO later — applies equally to an inventor-president. 109 Fed. Cl. at 741-45 (finding that disclosing proprietary information to a company president who was "actively involved in pursuing patents" posed a "risk that [the president] may inadvertently misuse confidential information" and ultimately precluding the company president's access to the confidential information); *see also Standard Space Platforms*, 35 Fed. Cl. at 508-09.

As a threshold matter, a court imposing a patent prosecution bar must be satisfied that the kind of information in question "is relevant to the preparation and prosecution of patent applications before the PTO." *In re Deutsche Bank*, 605 F.3d at 1381. Then, the "party seeking imposition of a patent prosecution bar must show that the information designated to trigger the bar, the scope of activities prohibited by the bar, the duration of the bar, and the subject matter covered by the bar reasonably reflect the risk presented by the disclosure of proprietary competitive information." *Id.* This Court then balances the risk the movant identifies against the potential "harm in barring the [non-movant's] company's officer from full participation in the litigation." *Ross-Hime Designs*, 109 Fed. Cl. at 743. "In balancing these conflicting interests[,] the [trial] court has broad discretion to determine what degree of protection is required." *Deutsche Bank*, 605 F.3d at 1380.

The source code at issue in this motion is an integral component in the creation and implementation of the patented technology. Indeed, for software patents, the source code — while not itself patentable pursuant to 35 U.S.C. § 101 — is the blueprint that outlines how the patent is enabled and practiced. *See Thales Visionix, Inc. v. United States*, 149 Fed. Cl. 38, 48 (2020) (discussing the importance of source code to infringement claims involving software patents). This case is no different. The proprietary government source code can potentially be used, for instance, to improve "numerical analysis routines," '355 Patent at Abstract, and to more "efficiently manipulate, analyze, and transmit [XBRL] reports." '842 Patent at Abstract. This Court therefore finds that the source code at issue easily bypasses the threshold barrier of patent prosecution relevancy.

The government credibly argues that a one-year patent prosecution bar, covering only the relevant technology, is a reasonable prerequisite restriction for Mr. Davis to obtain access to the source code. e-Numerate itself asserts that Mr. Davis is an expert in data entry and validation technology and proficient in the "very confusing" source code

at issue — code that is understood by few others.  Tr. at 21:7-17.  Accordingly, e-Numerate does not and cannot dispute the real possibility that Mr. Davis's access to proprietary source code may be used advantageously before the PTO.  Instead, e-Numerate insists that Mr. Davis has no currently pending patent applications and that his current role at Econometrica does not consist of system development.  ECF No. 186 at 7-8.  But this does not preclude the *potential* for Mr. Davis to misuse any government source code to which he is permitted access.  If anything, e-Numerate's assertion militates *against* the notion that a one-year patent prosecution bar would cause e-Numerate any harm.  In other words, taking e-Numerate at its word, the fact that Mr. Davis has no patents pending, or in development, suggests that a one-year prosecution bar would be harmless.  At oral argument, this Court repeatedly questioned counsel for e-Numerate on the issue, but he could not describe how Mr. Davis could possibly be impaired by the imposition of the bar.  *See* Tr. at 23:14 — 24:16 ("The Court: . . . I just asked you what the harm is and you said, in effect, [']none['] . . . [so] I don't really understand. What are you giving away? [e-Numerate's Counsel]: Just a restriction on him at some point in the future, but there — I agree, Your Honor.").

Because Mr. Davis could use the government's proprietary source code to his advantage in proceedings before the PTO and because Mr. Davis will not incur any harm due to a one-year patent prosecution bar, this Court **GRANTS** the government's motion, effectively converting the interim patent prosecution bar that the parties already executed into a one-year bar supplementing the existing protective order.

## IV.    E-NUMERATE'S MOTION TO COMPEL

On September 25, 2025, e-Numerate moved to compel responses from the government to seven interrogatories that e-Numerate argues the government had either refused to answer entirely or to which the government had provided incomplete responses.  ECF No. 188.  The government then supplemented some of its interrogatory responses and thus argued, in its response brief, that e-Numerate's motion had been rendered moot.  ECF No. 196 at 1.  e-Numerate filed its reply brief on November 14, 2025, maintaining that its motion was *not* moot for all but one of the seven interrogatories at issue.  ECF No. 204.

The six disputed interrogatories are split into three distinct subgroups.  Interrogatories Nos. 1-3 deal with the agency systems and components that validate XBRL filings.  ECF No. 188 at 6-9.  Interrogatory No. 4 asks the government to identify

systems and components that transform numerical values in XBRL filings. *Id.* at 9-10. And Interrogatories No. 5 and No. 6 ask the government, respectively, to describe the factual and legal bases for each of its affirmative defenses and to provide claim charts that articulate the government's noninfringement positions. *Id.* at 10-11. This Court addresses each subgroup in turn.

### A.  Interrogatories Nos. 1-3

Interrogatory No. 1 asks the government to identify all systems from all accused agencies that validate XBRL filings. ECF No. 188 at 6. Interrogatories No. 2 and No. 3 build on this request and, respectively, ask the government to identify the documents (presumably within the requested production) and the sections of source code that perform various aspects of the validation of the XBRL filings. *Id.* at 7-9.

e-Numerate's asserts in its motion to compel that, in response to Interrogatory No. 1, the government failed to respond as to FDIC/FFIEC. ECF No. 188 at 6. For Interrogatories No. 2 and No. 3, e-Numerate accused the government of only providing responses regarding the SEC but not as to all the other agencies accused of infringement. *Id.* at 7-9. Following e-Numerate's motion, the government supplemented its answer to Interrogatory No. 1 as to the FDIC/FFIEC, and its answers to Interrogatories No. 2 and No. 3 as to all the remaining agencies except for USDOT/OMB.[11] ECF No. 196 at 5-7. In opposing the motion to compel, the government asserts that there is a valid reason for its supposed omission. *Id.* The government maintains — as it has since it provided its initial interrogatory responses to e-Numerate on June 28, 2024, ECF No. 205-1 at 8 — that USDOT and OMB do *not* receive XBRL filings. ECF No. 196 at 5-7. Rather, the filings that e-Numerate identified at some point as potentially infringing were comma-separated-values ("CSV") files that, in the government's view, were not responsive to e-Numerate's interrogatories.[12] *Id.* Therefore, the government argues its responses to these

---

[11] The Court does not understand why these two agencies are grouped in this way. Indeed, at oral argument the Court inquired as to "why do[es e-Numerate] link the two, by the way? Those are two separate agencies. One is a cabinet agency, and OMB sits in the Executive Office of the President." Tr. at 41:12-15. e-Numerate responded that it was unsure but offered that after scheduled depositions it would hopefully become clear at which of these two agencies XBRL files are validated. *Id.* at 41:16 — 42:5. For now at least, the Court will proceed, as both parties have, assuming that either Treasury or OMB is responsible for some data processing validation that might give rise to possible patent infringement claims.

[12] *See* https://www.loc.gov/preservation/digital/formats/fdd/fdd000323.shtml (discussing CSV files).

three interrogatories were complete, rendering e-Numerate's motion moot (at least as to these interrogatories). *Id.*

e-Numerate disputes that the government has sufficiently supplemented its responses and, instead, asserts that the motion remains ripe for this Court's resolution. ECF No. 204 at 4-5.  Specifically, e-Numerate posits, *for the first time in its reply brief*, that the government's answer to Interrogatory No. 1 was deficient because it failed to include information from USDOT/OMB.  *Id.*  e-Numerate contends that USDOT/OMB's use of CSV filings may constitute infringement under the doctrine of equivalents and that the government cannot avoid responding based on a noninfringement defense.  *Id.* Regarding Interrogatories No. 2 and No. 3, e-Numerate presses substantially the same complaint: that the government must provide responses as to USDOT/OMB because CSV files might infringe pursuant to the doctrine of equivalents.  *Id.*

e-Numerate's position is puzzling, at the very least.  First, e-Numerate's initial motion sought to compel a supplementary response to Interrogatory No. 1 *solely* about "the FDIC/FFIEC."  ECF No. 188 at 6.  Then, once the government supplied that very information, e-Numerate attempts a bait-and-switch, seeking, for the first time in its reply brief, information from USDOT/OMB.  Of course, a party cannot, in its reply brief, move to compel information not requested in its opening motion.  *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief — they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.").  When confronted with this very problem at oral argument, e-Numerate attempted to gloss over this issue because e-Numerate had taken the government's initial interrogatory response — that there was nothing to produce from USDOT/OMB because it did not validate any XBRL files — "at face value."  Tr. at 40:19. According to e-Numerate, only after the government's opposition brief — regarding the government's answers to Interrogatories No. 2 and No. 3 — did e-Numerate realize that the reason the government did not supply USDOT/OMB data was because the government viewed CSV files as not infringing e-Numerate's patents.  *Id.* at 40:17- 41:6.

The record critically undermines e-Numerate's version of events.  More than a year ago, the government informed e-Numerate that the government's answer to Interrogatory No. 1 was complete because USDOT/OMB performed validation using CSV and not XBRL.  *See* ECF No. 205-1 at 8 ("The Department of Treasury has never received XBRL filings . . . [i]nstead, it receives CSV files.").  Thus, e-Numerate has known

for over a year — or at least could have known, had it read the government's responses carefully — that the government would not provide interrogatory responses related to CSV files because it viewed CSV filings as not capable of infringing e-Numerate's patents. In sum, e-Numerate is approximately 454 days late[13] and one proper motion to compel short.

Perhaps more important, e-Numerate's entire theory of the burdens of discovery is warped. As discussed more fully below regarding Interrogatory No. 4, it is not the government's job to interpret interrogatories as broadly as possible to accommodate all conceivable but as of yet unasserted infringement theories that the plaintiff might later concoct (*i.e.*, under the doctrine of equivalents). If e-Numerate wanted information from USDOT/OMB because e-Numerate thought the CSV files might constitute infringement, e-Numerate's should have served a targeted interrogatory expressly asking about how USDOT/OMB processes CSV files. e-Numerate cannot ask for all XBRL information, and then be surprised when all it receives from the government is XBRL information.

Accordingly, e-Numerate's motion to compel supplementary responses to Interrogatory Nos. 1-3 is **DENIED**.

### B. Interrogatory No. 4

e-Numerate's Interrogatory No. 4 requests that the government "identify all systems and components thereof that are capable of transforming numerical values in XBRL filings" and produce related information regarding the agency's use of the identified systems and the frequency of the transformations. ECF No. 188 at 9. The government, in its initial answer to that interrogatory, understood "capable of transforming numerical values in XBRL filings" to mean "transforming numerical values in an XBRL file into different numerical values in a XBRL file." ECF No. 205-1 at 23. With this understanding in place, the government asserted that the SEC and FERC/DOE do not perform any such transformations and that the government's answer to this interrogatory was complete. *Id.* at 24. Just as e-Numerate did for the first three interrogatories, it complains that the government cannot evade discovery requests by

---

[13] This Court has calculated 454 as the number of days between June 28, 2024, when the government first informed e-Numerate that it was withholding interrogatory responses as to USDOT because it validates only CSV files and not XBRL files, ECF No. 205-1, and September 25, 2025, when e-Numerate filed its motion to compel, ECF No. 188.

making noninfringement arguments to itself and then answer an interrogatory based on a jaundiced view of a viable infringement theory.  ECF No. 188 at 9-10.

e-Numerate also harps on earlier proceedings before Judge Holte, who supposedly allowed e-Numerate to file a third amended complaint specifically to allow e-Numerate to advance its doctrine of equivalents theory of infringement.  *See* ECF No. 188 at 9 (asserting that Judge Holte granted e-Numerate's motion to file a third amended complaint to "assert infringement by the SEC analytical systems"); ECF No. 204 at 5-6.  e-Numerate insists that whatever transformation occurs in the SEC's database, e-Numerate "explicitly argued that this could infringe the '816 and '383 Patents under the doctrine of equivalents, and the Court agreed."  ECF No. 188 at 10.[14]  Thus, e-Numerate maintains that the government must further supplement its answer to Interrogatory No. 4 with SEC's information to account for e-Numerate's doctrine of equivalents theory.  *Id.*[15]

The Court's analysis of Interrogatories Nos. 1-3 applies with equal force to Interrogatory No. 4.  e-Numerate cannot ask the government to do its work and hypothesize what "transforming numerical values in XBRL filings" might mean under an unspecified doctrine of equivalents theory.  Furthermore, e-Numerate similarly knew the government's position regarding the SEC (and FERC/DOE) in June of 2024 when the government provided e-Numerate with the government's interrogatory responses.  ECF No. 205-1 at 23-24.  e-Numerate had ample time to serve a targeted interrogatory that

---

[14] e-Numerate did not provide a citation for this proposition and the Court cannot locate any source that supports it.  Judge Holte and the parties *did* discuss a doctrine of equivalents theory regarding the '816 and '383 Patents, ECF No. 144 at 27, but it was not quite the same theory e-Numerate now advances: that the transformation of XBRL filings need not be in XBRL format so long as some transformation takes place.  *See id.* (e-Numerate arguing that "there's a potential equivalence issue as to whether a database representation of a markup document is equivalent to a markup document").  In any event, Judge Holde did not agree — during oral argument or in his subsequent order — to any of e-Numerate's theories of infringement, or any specific equivalents theory.  And he certainly nowhere concluded that the government must adopt some unspecified equivalents theory e-Numerate never supplies in its interrogatories or infringement contentions.  e-Numerate has exaggerated the reach of Judge Holte's previous order.  There is no requirement for the government to assume an undescribed doctrine of equivalents when responding to e-Numerate's discovery requests.

[15] This Court's conclusion regarding the SEC applies to FERC/DOE as well, although it is not at all clear that e-Numerate has preserved the issue.  That is because e-Numerate, in its motion, focuses on the government's failure to provide information from the SEC in response to Interrogatory No. 4, and mentions FERC/DOE only in passing.  ECF No. 188 at 9-10.  And e-Numerate does not even mention FERC/DOE in its reply brief.  ECF No. 204 at 5-6.

asked specifically for the transformations that occurs in those agencies' systems, whether in XBRL format or otherwise.

Moreover, e-Numerate's assertion that this Court's authorization to file a third amended complaint somehow proves that e-Numerate is entitled to additional interrogatory responses — based on various doctrine of equivalents theories — is tenuous at best. To review: e-Numerate, in its second amended complaint, included a single boilerplate sentence asserting infringement under the doctrine of equivalents that sufficiently preserved its right to assert the doctrine at trial. ECF No. 53 at 45. Much later, e-Numerate moved for leave to file a third amended complaint and to compel documents relating to the accused SEC system. ECF Nos. 122; 123. During oral argument on those two motions, Judge Holte *did* discuss a doctrine of equivalents theory with e-Numerate, *but* that discussion centered around the SEC's "analytical systems" and Interrogatory No. 7, which is not at issue in this motion. *See* ECF No. 144 at 27:4 — 30:23. Judge Holte then granted leave to file a third amended complaint and granted the motion to compel, ordering the government to respond to various interrogatories *after* e-Numerate "modif[ies] and refine[s] [its] discovery requests . . . to be more targeted to request for the readily available documents, such as representative versions of the SEC analytical systems at issue." ECF No. 141 at 3.

But rather than heed Judge Holte's order and proceed in a targeted manner, e-Numerate simply repeated the identical boilerplate language in the third amended complaint (from the second amended complaint). *See* ECF No. 142 at 54. And e-Numerate never narrowed or refined the broadly worded (and vague) interrogatories that precipitated the current discovery dispute. If e-Numerate believed that the SEC transformations (or, for that matter, the CSV files at issue in Interrogatories No. 1-3) infringed under the doctrine of equivalents, e-Numerate could have asserted that theory at any time — for instance, in the complaint, in infringement contentions, or in the interrogatories themselves. Instead, e-Numerate chose to proceed with a broad, unspecified infringement theory, and is now effectively demanding that the government do e-Numerate's job of narrowing and fine-tuning those theories.

To make matters worse, e-Numerate is simply incorrect about its discussion with Judge Holte and his subsequent order. Judge Holte never approved *any* specific doctrine of equivalents theory during oral argument, let alone the ones advanced by e-Numerate in this motion. That is probably why the phrase "doctrine of equivalents" never appears in his order. *See* ECF No. 141. At most, e-Numerate can argue that Judge Holte did not

*dismiss* an equivalents theory and that, in granting leave for e-Numerate to file a third amended complaint, Judge Holte provided e-Numerate with the opportunity to assert specific infringement theories "*explicit[ly]* within the scope of the case."  ECF No. 144 at 31 (emphasis added).  But e-Numerate did not do so.  After having the opportunity to assert a specific doctrine of equivalents theory, but failing to do so, e-Numerate cannot characterize Judge Holte's order — which, again, does not contain the phrase "doctrine of equivalents" — as an endorsement of e-Numerate's interpretation of the interrogatories or as supporting its motion to compel.

But all this is beside the point.  e-Numerate's entire argument, as discussed above regarding Interrogatories Nos. 1-3, is erroneous.  Even had the government not already supplied e-Numerate with the government's view of SEC transformations a year ago, and even had Judge Holte expressly discussed the doctrine of equivalents in his December 6, 2024, order, ECF No. 141, e-Numerate would still not be able to demand that the government account for every possible (undisclosed) doctrine of equivalents argument in its interrogatory responses.  In other words, the government does not have the responsibility during discovery to imagine every possible transformation method on the off chance that e-Numerate might consider it infringement under the doctrine of equivalents.  Indeed, e-Numerate's view of the law would require defendants in patent cases to dream up every conceivable infringement theory on behalf of the plaintiff and then supply the plaintiff with the corresponding discovery.  That cannot be correct.  If a plaintiff wants discovery responses regarding a theory of infringement that rests upon the doctrine of equivalents, the plaintiff must pose pointed, targeted interrogatories that make that theory clear.  At a minimum, such a rule makes sense because it places the onus for precision on the plaintiff — the party which best understands what information it seeks and, thus, is the least cost avoider for later discovery disputes of this nature.

Accordingly, e-Numerate's motion to compel the government's further response to Interrogatory No. 4 is **DENIED**.

### C.  Interrogatories No. 5 and No. 6

Interrogatory No. 5 requests that the government describe the factual and legal basis for each affirmative defense that the government plans to assert and to identify any witnesses knowledgeable about those defenses.  ECF No. 188 at 10.  Interrogatory No. 6 requests that the government provide claim charts laying out its noninfringement positions for each asserted claim.  *Id.* at 11.  The dispute as to these interrogatories is a relatively narrow one.  That is because the government appears to acknowledge that contention interrogatories are, in general, proper.  ECF No. 196 at 10-11 (citing cases that deny contention interrogatories as being overbroad or premature); ECF No. 205-1 at 25-28; *see also O2 Micro*, 467 F.3d at 1365 (observing that contention interrogatories can be "useful in narrowing and sharpening the issues, which is a major purpose of discovery," because they allow parties to "pin down . . . theories of liability [and] theories of defense, thus confining discovery and trial preparation to information that is pertinent to the theories of the case" (citing *Hickman v. Taylor*, 329 U.S. 495, 501, (1947))).  The government thus disputes only the breadth of e-Numerate's request and the timing — that it is still too early to stake out with certainty the contours of its entire defense and trial strategy.  ECF No. 196 at 10-11.  That is especially true, according to the government, with respect to Interrogatory No. 6 because e-Numerate's infringement contentions fail in multiple respects to put the government on notice of e-Numerate's infringement position.  *Id.* at 11-12.  The government cannot rationally determine its noninfringement arguments before e-Numerate concretely lays out its infringement arguments.  *Id.*  As discussed below, this issue is the basis for the government's cross-motion to strike particular infringement contentions.  *Id.* at 15-19.

This Court, for the most part, agrees with the government on both counts.  Our system of discovery is designed so that a party does not face a "trial by ambush."  *Ideal Innovations, Inc. v. United States*, 167 Fed. Cl. 314, 344 (2023).  But that does not mean that parties must disclose each and every argument, sub-argument, and how it plans to use particular documents and witnesses.  *Aldapa v. Fowler Packing Company Inc.*, 310 F.R.D. 583, 591 (E.D. Cal. 2015) ("Parties are not tasked with laying out every jot and tittle of their evidentiary case in response to interrogatories.  Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." (quoting *Lucero v. Valdez,* 240 F.R.D. 591, 594 (D.N.M. 2007))).  A party is certainly not expected to have fully developed its trial defense strategy before expert discovery even begins.  *Hitkansut*, 127 Fed. Cl. at 108 n.4 ("There is substantial

reason to believe that the early . . . filing of sets of contention interrogatories that systematically track all the allegations in an opposing party's pleadings . . . can be used to impose great burdens on opponents, and can generate a great deal of counterproductive friction between parties and counsel." (quoting *In re Convergent Tech. Sec. Litig.*, 108 F.R.D. 328, 337-38 (N.D. Cal. 1985))). On the other hand, as this Court warned the government during oral argument, delaying responses to these interrogatories comes with a risk: if the government presents a novel defense or noninfringement theory late in discovery — and particularly after depositions have been taken — this Court may well grant e-Numerate leave to engage in yet further discovery as needed, possibly at the expense of the government. Tr. 83:1 — 85:12.

Because fact discovery will continue for many more months, the Court finds that it is too early to compel the government to respond to these contention interrogatories at this time. Accordingly, e-Numerate's motion to compel supplementary responses to Interrogatories No. 5 and No. 6 is **DENIED**. As discussed during oral argument, however, and as agreed to by the parties, the government shall provide updated, complete, and final responses to Interrogatories No. 5 and No. 6 no later than thirty days prior to the close of fact discovery. Tr. at 85:1-12; 89:6-11. If the government materially changes its affirmative defenses or noninfringement positions, this Court may allow e-Numerate to conduct further depositions or engage in further discovery as needed. The Court, in the interest of justice and consistent with RCFC 37(b), may impose costs and attorney's fees on the government for any such additional discovery that may be required.

## V. THE GOVERNMENT'S CROSS-MOTION TO ORDER SUPPLEMENTATION OF E-NUMERATE'S RESPONSES TO THE GOVERNMENT'S INTERROGATORIES

On October 20, 2025, the government moved to compel supplementation of e-Numerate's interrogatory responses. ECF No. 196 at 13. The government complained that e-Numerate's responses were deficient in two ways: (1) the responses were not verified by an officer or agent of e-Numerate; and (2) that, in violation of RCFC 33(d)(1), e-Numerate did not specify, in sufficient detail, where publicly available documents were located. *Id.* e-Numerate then supplemented its responses with the required verifications and various documents mooting the first alleged deficiency and most of the second alleged deficiency. ECF No. 204 at 7; ECF No. 205 at 6. The only dispute that remains relates to e-Numerate's responses that include bare references to the Wayback Machine

without providing precise website links (known as Uniform Resource Locators ("URLs")) or dates of the webpage captures. ECF No. 205 at 6-7.

The Court agrees with the government that e-Numerate's conduct is improper. The government cannot be expected to hunt through Wayback Machine website captures to find e-Numerate's responsive information. That is particularly true where e-Numerate knows the specific location. A responding party must provide exactly what RCFC 33(d)(1) requires: the whereabouts of "records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could." RCFC 33(d)(1).

Accordingly, the Court **DENIES, AS MOOT, IN PART** and **GRANTS IN PART** the government's motion to compel. Within fourteen days of the issuance of this order, e-Numerate shall identify precisely where the government can find the Wayback Machine captures e-Numerate references in its interrogatory responses.

## VI. THE GOVERNMENT'S CROSS-MOTION TO STRIKE E-NUMERATE'S INFRINGEMENT CONTENTIONS

On October 20, 2025, the government moved to strike portions of e-Numerate's infringement contentions that the government deemed insufficient. ECF No. 196 at 15-19. The government complains that, in three respects, e-Numerate's infringement contentions fail to give the government notice regarding e-Numerate's precise infringement theory. *Id.* First, the government argues that e-Numerate fails to identify how any government agency might satisfy the "application including a network browser" element in Claim 1 of the '748 Patent. ECF No. 196 at 15-16. Instead, according to the government, e-Numerate simply directs the government to agency uses of publicly available websites but does not further explain how the use of a website alone is an "application including a network browser." *Id.* Second, the government asserts that e-Numerate fails to identify a "computer-readable Extensible Markup Language ("XML")-compliant data document" as required by Claim 1 of the '748 Patent and Claim 29 of the '842 Patent. *Id.* at 16-17. Instead, e-Numerate points to various applications but does not specifically identify an XML-compliant data document that would be covered by the claims. *Id.* Finally, the government complains that e-Numerate does not specify the source code that any agency used that would satisfy the limitations of various claims that either explicitly or implicitly require "code." *Id.* at 17-19 (discussing '383 Patent at Claim 1; '748 Patent at Claim 1).

The Court concludes that striking e-Numerate's contentions at this stage would be premature and unfair. After all, the Court is now allowing the government itself to amend its invalidity contentions. *See supra*, Part II. Moreover, e-Numerate's failure to properly identify specific source code is at least partly because Mr. Davis was not allowed to inspect the source code until very recently. *See supra*, Part III. Similarly, the failure to identify XML-compliant documents is potentially tied to e-Numerate's doctrine of equivalents theory regarding CSV files. *See supra*, Part IV. And indeed, during oral argument, the government acknowledged that requiring e-Numerate to amend its infringement contentions rather than strike them in their entirety would be the prudent way to proceed. *See* Tr. at 106:13-17 (government counsel's agreeing that there would be no prejudice to the government if e-Numerate were allowed to update the contentions as to "the specific source code"). Accordingly, this Court will permit e-Numerate to amend its infringement contentions rather than imposing a harsher penalty.

This Court also determines that e-Numerate's failure to identify the source code upon which so many of the infringement claims rely is, indeed, unacceptable. The government is entitled to know which specific section(s) of source code will be at issue at trial. Accordingly, the Court **GRANTS IN PART** the motion to strike with respect to the source code citations insofar as e-Numerate is required to amend the infringement contentions. Within seven days of the issuance of this order, the government shall provide e-Numerate with a complete list of all references to source code within e-Numerate's infringement contentions that the government deems insufficient. Within twenty-one days of receiving that list, e-Numerate shall provide the government with proper citations to the identified source code.

On the other hand, e-Numerate's vague references to websites that supposedly satisfy the "application including a network browser" element — and its reference to applications that may be literally (or equivalently) XML-compliant documents — are not facially deficient. Accordingly, the Court **DENIES IN PART** the motion to strike with respect to the "application including a network browser" and "XML-complaint data document" elements. Nevertheless, this Court cautions e-Numerate that it will not be permitted to develop new and surprising infringement theories at trial or in response to a motion for summary judgment. Thus, e-Numerate may well want to take advantage of this opportunity to amend its infringement contentions to address the areas about which the government complains. Should e-Numerate choose to exercise this option, e-Numerate shall have twenty-eight days to serve amended infringement contentions.

**VII.    CONCLUSION**

The government's motion to amend its invalidity contentions is **GRANTED**.  The government's motion to redesignate a portion of its production as competition-sensitive and to impose a one-year patent prosecution bar on Mr. Russell Davis is **GRANTED**.  e-Numerate's motion to compel supplementary responses is **DENIED**.  The government's motion to compel supplementary responses is **DENIED, AS MOOT, IN PART** and **GRANTED IN PART**.  The government's motion to strike e-Numerate's infringement contentions is **DENIED IN PART** and **GRANTED IN PART** insofar as e-Numerate is required to amend its infringement contentions as ordered *supra*.  Finally, as agreed to by both parties at oral argument, and to facilitate compliance with this order, the discovery schedule is amended such that the close of fact discovery is extended to June 5, 2026.  On or before May 22, 2026, the parties shall file a joint status report proposing a schedule for expert discovery.

**IT IS SO ORDERED**.

<u>s/Matthew H. Solomson</u>
Matthew H. Solomson
Chief Judge